USCA1 Opinion

 

 September 27, 1995 United States Court of Appeals For the First Circuit _____________________________ No. 95-1023 FLANDERS & MEDEIROS, INC., Plaintiff, Appellee, v. ELIZABETH V. BOGOSIAN, Defendant, Appellant. _____________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Ronald R. Lagueux, U.S. District Judge] ___________________ _____________________________ Before Torruella, Chief Judge, ___________ Stahl, Circuit Judge, _____________ and Dominguez, * District Judge.  ______________ _____________________________ ERRATA SHEET ERRATA SHEET Please make the following correction: Page 2, line 5 from bottom of page: Delete "Woloohojian (now deceased) and Harry Woloohojian." Insert "Woloohojian and Harry Woloohojian (now deceased)." _______________________________ *Of the District of Puerto Rico, sitting by designation. United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 95-1023 FLANDERS & MEDEIROS, INC., Plaintiff, Appellee, v. ELIZABETH V. BOGOSIAN, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Ronald R. Lagueux, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Stahl, Circuit Judge, _____________ and Dominguez,* District Judge. ______________ ____________________ Keven A. McKenna with whom Bruce Hodge was on brief for ________________ ___________ appellant. Matthew F. Medeiros and Erik Lund with whom Robert Karmen, ___________________ _________ _____________ Flanders & Medeiros Inc., Cynthia C. Smith, and Posternak, Blankstein ________________________ ________________ _____________________ & Lund were on brief for appellee. ______ ____________________ September 13, 1995 ____________________ _____________________ *Of the District of Puerto Rico, sitting by designation. STAHL, Circuit Judge. This case arises from the STAHL, Circuit Judge. _____________ representation of defendant-appellant Elizabeth Bogosian ("Bogosian") by plaintiff-appellee Flanders & Medeiros ("F&M") in hotly contested litigation involving family real- estate partnerships. After Bogosian failed to endorse over to F&M checks made payable to Bogosian by the defendant in the underlying litigation and delivered to F&M as her counsel, F&M sued Bogosian for breach of contract. Bogosian counterclaimed for malpractice and breach of the attorney- client contract. The district court awarded summary judgment to F&M on all claims. We now reverse the award of summary judgment on F&M's breach-of-contract claim, and affirm the district court's ruling on Bogosian's counterclaims. I. I. __ In November 1989, following the withdrawal of Bogosian's prior counsel from the underlying litigation, F&M, a Providence, Rhode Island, law firm, took over the representation of Bogosian, a citizen of Florida, in the ongoing lawsuits stemming from her involvement in a family real estate empire created by her and her two brothers, James H. Woloohojian and Harry Woloohojian (now deceased). Bogosian had few liquid assets at the time from which to pay her lawyers but stood to receive substantial amounts as a result of her lawsuits. In a letter sent to Bogosian on November 24, 1989 (the "November 24 letter"), and which -2- 2 Bogosian then signed indicating her agreement, F&M explained the terms of its representation. The firm would obtain a $25,000 retainer from Bogosian, to be deposited in an interest-bearing account; it would bill Bogosian each month at its lawyers' hourly rates, with each bill due and payable within ten days after receipt; and interest would accrue (at a local bank's prime rate) on bills outstanding for sixty days or more. The letter further stated: We recognize that you may be unable to pay our monthly statements in full on an ongoing basis. To the extent that you ________________________ are unable to pay those bills from other _________________________________________ sources, you have agreed to apply your _________________________________________ first proceeds out of the E & J _________________________________________ receivership, the Woloohojian Realty _________________________________________ Associates receivership and/or the _________________________________________ federal court litigation,[1 ] until all _________________________________________ of our outstanding bills, including any _________________________________________ accrued interest, are paid in full. _________________________________________ Appended to this letter as Exhibit A is an Assignment that we would ask you to execute. That assignment gives us an interest in the proceeds of those court proceedings up to the amount of our bills. It is my understanding that you  ____________________ 1. The "E & J receivership" and the "Woloohojian Realty Associates receivership" are state court actions concerning two family real estate partnerships. The "federal court litigation" (or "valuation" litigation) was brought by Bogosian in the United States District Court for the District of Rhode Island to dissolve the family-owned Woloohojian Realty Corporation ("WRC"), pursuant to Rhode Island corporations law. See R.I. Gen. Laws 7-1.1-90. After ___ Bogosian filed her lawsuit, WRC exercised its option to buy out Bogosian's one-third share of the corporation rather than face dissolution. In April 1995, the district court adopted as its findings the report of a special master valuing Bogosian's WRC stock at $4,901,801. See Bogosian v. ___ ________ Woloohojian, 882 F. Supp. 258, 261, 266 (D.R.I. 1995).  ___________ -3- 3 have reviewed this agreement with Ted Pliakas[2] and have found it acceptable. (emphasis added). The referenced assignment (the "assignment document") included the following language: 1. Assignee has agreed to represent Assignor in said actions at hourly rates set forth in a letter from Assignee to Assignor dated November 24, 1989. 2. Assignor anticipates that she will ____________________________________ receive substantial sums in said actions _________________________________________ (the "Recoveries"), out of which she _________________________________________ expects and agrees to pay the legal fees _________________________________________ and out-of-pocket expenses payable to _________________________________________ Assignee. _________ 3. To the extent that Assignor owes ____________________________________ Assignee any money for out-of-pocket _________________________________________ expenses and legal services rendered by _________________________________________ Assignee in connection with said actions, _________________________________________ Assignor hereby assigns to Assignee, _________________________________________ effective as of the day and year first _________________________________________ above written, that portion of the _________________________________________ Recoveries which is necessary to pay all _________________________________________ of Assignee's then unpaid bills. The ___________________________________ remainder of the Recoveries shall be payable to Assignor. 4. In the event that there is a recovery in fewer than all of said actions, and Assignee is paid in full, and Assignor later incurs additional legal expense to Assignee which is not paid on a current basis, Assignee shall be paid such additional legal expense out of additional amounts, if any, recovered by Assignor in the remaining actions. 5. Nothing contained herein shall be construed so as to limit Assignee to payment of its legal expenses from amounts recovered by Assignor in said actions.  ____________________ 2. Bogosian's personal attorney. -4- 4 (emphasis added). Both parties signed the document. F&M filed an appropriate financing statement with the office of the Secretary of State, asserting F&M's rights as secured party to "[a]ll of Debtor's rights to the recoveries received by Debtor arising from" Bogosian's various lawsuits. F&M represented Bogosian pursuant to the above terms in at least ten different matters between late 1989 and the end of 1992, with the bulk of its time devoted to the valuation litigation. In July 1990, the district court in that case ordered WRC (1) to grant Bogosian a $10 million mortgage on one of WRC's properties as security to guarantee eventual payment of her shares' value once that value had been determined, and (2) to provide Bogosian with "interim distribution" payments of an initial $100,000 plus $10,000 per month, to continue until the entry of a final judgment determining the fair value of her shares.3 On December 23, 1992, without -- so far as the record shows -- any solicitation from either Bogosian or F&M, WRC delivered two checks to F&M made payable to Bogosian.4  ____________________ 3. F&M asserted no claim to these payments, presumably because it had argued to the district court that the payments were necessary for Bogosian to meet her day-to-day expenses and demands of other creditors. WRC appealed the district court's order, and we affirmed. Bogosian v. Woloohojian ________ ___________ Realty Corp., 923 F.2d 898 (1st Cir. 1991). ____________ 4. The voluntary payment followed on the heels of a jury verdict in Bogosian's favor in a Massachusetts state court lawsuit initiated by WRC, in which WRC sought damages in excess of $20 million for Bogosian's alleged usurpation of -5- 5 The checks, one for $900,000 and the other for $100,000, were accompanied by a letter stating the following: Enclosed please find two (2) Woloohojian Realty Corp. ("WRC") checks totalling $1 Million Dollars payable to Elizabeth V. Bogosian. This sum represents a voluntary principal payment made by WRC on account of Mrs. Bogosian's former shareholder interest. This entire sum shall constitute an immediate credit toward any principal sums which may become due and owing to Mrs. Bogosian in the federal court proceeding on account of WRC's purchase of her shares and/or WRC's liquidation. WRC, James Woloohojian and the Estate of Harry Woloohojian remain willing to negotiate a global settlement with Mrs. Bogosian which covers all of the substantive areas detailed in the offer of settlement dated September 30, 1992 which I sent to Mr. Prentiss. If Mrs. Bogosian is interested in a global ______ settlement, kindly forward her written counterproposal on or before December 31, 1992. We are prepared to meet immediately thereafter to negotiate a final resolution. Kindly acknowledge your receipt of this letter and the two checks by signing and returning the enclosed copy of this letter. . . . When WRC delivered the checks to F&M's offices, Bogosian owed the law firm $999,957 in accrued legal fees, expenses and interest. F&M contacted Bogosian's attorney  ____________________ corporate opportunities. WRC had previously held out the prospect of obtaining substantial damages from this and other lawsuits -- thus offsetting the value of Bogosian's stock in WRC -- in contesting Bogosian's request for interim distributions in the valuation litigation. -6- 6 (Pliakas)5 and asked that Bogosian indorse the two checks over to F&M pursuant to their assignment agreement. Bogosian refused, and that same day faxed to F&M the following handwritten letter: Please be advised that I do not accept nor do I authorize the acceptance of a check from Woloohojian Realty Corp. or any affiliates as partial payment of any kind for any purpose. I have been advised, as your firm has represented to Judge Boyle, by Eustace T. Pliakas, Esq., my primary counsel, that a 355 division of the corporation would have no adverse tax consequences for me __ __ or WRC and that if his Honor Judge Boyle ___ so decides as to effect that result that it would be very favorable to me. As you know, WRC has purported that there will be major tax consequences for the liquidation of property in order to pay for my shares which sale Judge Boyle stated in the last hearing would "never happen." If by some means, at the time of Judge Boyle's final decision, I am forced to take dollars instead of mortgageable property, I question whether or not such principal of tax effecting does not apply to me. [sic] In any event I do not wish to prematurely determine Judge Boyle [sic] final [unreadable] decision. I will only accept, as I have requested you pursue, similar interim relief as I have received in the past to meet my on going obligations.  ____________________ 5. F&M explained that it contacted Pliakas rather than Bogosian directly because it recognized that it had a conflict of interest with Bogosian regarding the checks. -7- 7 I will not in my present health or circumstances accept any coercive tactics or any actions taken which is directed to creating fear of retribution to myself or any members of my family. WRC eventually dropped its requirement that Bogosian acknowledge in writing receipt of the checks (and possible acknowledgment that the checks were payments of principal rather than interest), but Bogosian still refused to indorse them. F&M and Pliakas discussed over the next couple of weeks whether the parties could share the money,6 but no agreement was reached. Thus, on January 14, 1993, F&M initiated the present action in the district court, alleging that Bogosian had breached the assignment agreement by refusing to indorse the checks over to F&M. Bogosian denied the breach, arguing that the checks were not "proceeds" from the litigation because neither the court nor she had authorized such payment, and counterclaimed, alleging legal malpractice and breach of contract by F&M. Following discovery, both parties moved for summary judgment. The district court ruled that F&M was entitled to summary judgment on all claims, and Bogosian appealed.   ____________________ 6. Bogosian claims that she neither knew of nor approved of these negotiations, but that Pliakas undertook them on his own because he feared that F&M's abandonment of Bogosian could severely harm her position in the ongoing litigations. -8- 8 II. II. ___ A. Standard of Review ______________________ We review a grant of summary judgment de novo, __ ____ reading the record in the light most favorable to the nonmovant. See, e.g., Byrd v. Ronayne, ___ F.3d ___ (1st ___ ____ ____ _______ Cir. 1995). Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). B. F&M's Breach-of-Contract Claim __________________________________ The district court granted F&M summary judgment on its breach-of-contract claim because the assignment agreement, the court reasoned, was an "absolute assignment" of Bogosian's "entire interest in any future proceeds from those litigations to F&M up to the outstanding amount of the legal bills. Having so assigned the proceeds, Bogosian had no power to reject them. She was obligated to indorse the checks and pay them over to F&M." Flanders & Medeiros, Inc. _________________________ v. Bogosian, 868 F. Supp. 412, 421 (D.R.I. 1994). Whether ________ Bogosian had a good faith basis for refusing the checks, the court held, is "irrelevant." Id. ___ The district court's analysis contains a fatal flaw: It assumes that, because Bogosian assigned her -9- 9 interest in future litigation proceeds up to the amount of any outstanding legal bills, she also gave up her right to reject any offer of partial payment. But the latter proposition does not necessarily follow from the former; a litigant may (and often does) assign expected proceeds while retaining the right to accept or reject any offer of payment or settlement. None of the cases cited by the district court ____ in support of its construction of the assignment agreement -- and subsequently adopted by F&M as authority for its position in its appellate brief -- stands for the proposition that an assignment of expected litigation proceeds deprives a litigant of his or her right to control the terms of settlement. For example, the court cited Berkowitz v. _________ Haigood, 606 A.2d 1157, 1160 (N.J. Super. Ct. Law Div. 1992) _______ (holding that assigned proceeds in attorney's trust account belong to client's assignee and client has no right to receive them), for the proposition that Bogosian, having assigned the proceeds, had no power to reject the proffered checks. But the funds the assignee was claiming in Berkowitz _________ were part of a settlement to which Haigood had agreed and ____________________________ which had already been paid into his attorney's trust account. Id. at 1159-60. The court's reliance on Herzog v. ___ ______ Irace, 594 A.2d 1106 (Me. 1991), is similarly misplaced. _____ That decision's holding that a "client is not entitled to receive funds once he has assigned them to a third party," -10- 10 id. at 1109, is predicated on the client's acceptance of the ___ ________ __________ settlement offer from which the funds in question derive, id. ___ at 1108. In neither of these cases did the assignee challenge the assignor-litigant's rejection of an offer of settlement or partial payment. Nothing in the assignment agreement purports to transfer Bogosian's fundamental right to control her own litigation and accept or reject a settlement offer, whether in whole or in part. See R.I. Rules of Professional Conduct ___ Rule 1.2(a) ("A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter."). Whether a contract that abrogated this axiomatic duty would even be upheld under Rhode Island law is a question we need not reach, for the assignment contains no indication whatsoever that the parties intended such a contract. Without a clear expression of intent to abrogate a fundamental rule of the attorney-client relationship, we would be loath to find such intent. Thus, the assignment of "recoveries" or "proceeds" by Bogosian to her attorneys presumes her prior acceptance of a proffered payment. ________ _____ Otherwise, the proffered payment remains nothing more than just that; until it has been accepted by the client or ordered by the court, it constitutes neither "proceeds" nor "recoveries" but only an offer of payment or partial settlement. -11- 11 Nor does F&M seriously dispute that Bogosian retained the right to accept or reject any settlement offer. In fact, F&M concedes in its brief that the assignment agreement operated as a security agreement, with Bogosian retaining control over her cause of action, and not as an absolute assignment of litigation rights: The agreement did not assign Bogosian's causes of action to F&M (F&M could not have sued WRC on those causes of action), but only assigned the first proceeds from the litigation; it did not give F&M an interest in the litigation beyond the amount of its earned fees and costs. Moreover, the assignment was not absolute: it would have been ineffective if Bogosian had simply paid her bills.7 Brief of Plaintiff-Appellee at 20.8 These concessions _____________________________  ____________________ 7. A few pages further along in its brief, F&M apparently decided that it had better argue that the assignment agreement was in fact an absolute assignment. Responding to Bogosian's attempt to distinguish In re Apex Oil Co., 975 ____________________ F.2d 1365 (8th Cir. 1992) -- which the district court cited for the proposition that an assignment transfers all rights in the assigned property -- on the ground that the assignment in that case was absolute rather than conditional, F&M informed this Court that "the assignment here was not conditioned upon anything." Brief of Plaintiff-Appellee at ____________________________ 28 n.13. We find F&M's first interpretation more convincing. 8. F&M also cited numerous cases as upholding agreements "such as the one between F&M and Bogosian," Brief of _________ Plaintiff-Appellee at 20, all of which construed the __________________ ___ agreements as security for an attorney's unpaid fees and expenses rather than as absolute assignments of proceeds. E.g., Skarecky & Horenstein, P.A. v. 3605 N. 36th St. Co., ____ ___________________________ _____________________ 825 P.2d 949, 952 (Ariz. App. 1991); In re Conduct of Taylor, _______________________ 878 P.2d 1103, 1110 (Or. 1994); Burk v. Burzynski, 672 P.2d ____ _________ 419, 423 (Wyo. 1983). Although the language of the agreements in some of these cases more clearly established that they were intended to operate as security agreements than the assignment agreement here, both the November 24 -12- 12 notwithstanding, F&M argues that Bogosian still had no right to reject WRC's $1 million voluntary payment because it was not an offer of settlement. At least after WRC dropped the requirement that Bogosian stipulate that the money would be applied to principal and not interest, F&M argues, WRC imposed no conditions on Bogosian's acceptance of the money. Therefore, so this argument goes, Bogosian could not have had any valid reason for rejecting the checks. This argument also misses the mark, for the proffered payment did in fact contain an implicit condition: namely, that the $1 million portion of Bogosian's ultimate award represented by the two checks would be paid in cash and not property. Bogosian, in accepting the checks, would be forgoing her right to attempt in the future to structure the payment of that portion of her award in an advantageous manner. Thus, while WRC's offer of payment may not have been a partial "settlement offer" in the usual sense, its acceptance nevertheless could have limited Bogosian's future options, and she may well have had legitimate reasons for refusal.  ____________________ letter and the assignment document limit Bogosian's assignment of proceeds to the extent that Bogosian has not paid F&M's bills. Thus, F&M would have no rights to any proceeds unless and only to the extent that Bogosian fails to pay her attorney's bills. This is an assignment for purposes of security. See In re Apex Oil, 975 F.2d at 1369 ("We see ___ _______________ no meaningful difference between a security interest and an assignment for purposes of security."). -13- 13 Moreover, there is evidence that the possibility of Bogosian ultimately receiving property rather than cash in exchange for her shares is no pipedream. The statute governing the valuation litigation provides that, once the value of Bogosian's shares have been determined, "the court shall set forth in its order . . . the purchase price and the time within which the payment shall be made, and may decree _______________ such other terms and conditions of sale as it determines to _____________________________________________________________ be appropriate . . . ." R.I. Gen. L. 7-1.1-90.1 (emphasis _______________ added). The district court in the valuation case recently stated: What [Bogosian's] judgment will be remains to be seen. It may be that the ___________________ court will order satisfaction of the _________________________________________ purchase price by the transfer of _________________________________________ particular parcels of real estate, at ____________________________________ least in part, a result contended for by Plaintiff. What is clear beyond peradventure is that it is for this Court to determine, under the precise terms of the statute, the "terms and conditions of sale as it determines appropriate." Until this Court has had the opportunity to do so, Plaintiff does not have a definable interest in any specific property. There is no judgment for Plaintiff which may be levied upon. Bogosian v. Woloohojian, C.A. No. 88-0373B, slip. op. at 7-8 ________ ___________ (D.R.I. Aug. 4, 1995) (emphasis added). Nevertheless, F&M argues that, even assuming that Bogosian eventually could receive property instead of cash as _____ payment for her shares, she could not have had a good-faith reason for rejecting the checks because: (1) she would -14- 14 eventually have to pay the law firm in cash, so even a disposition of property by the court would necessitate an eventual sale of assets, and (2) any payments made to F & M would be tax-deductible, so a cash payment from WRC would not have any adverse tax consequences. This argument is similarly unpersuasive: Bogosian could conceivably mortgage any property she receives and pay F&M from those funds, or perhaps F&M would even acquire an interest in the property. And even if a cash payout would be tax-deductible, Bogosian might prefer a disposition of property for non-tax-related reasons, e.g., because she believes the property is worth more than its court-assigned valuation, or because she believes its appreciation rate and income stream will more than compensate for interest costs she incurs in mortgaging it to pay off F&M. In any event, Bogosian asserted in her faxed response to F&M, on the same day that F&M requested her _______________ indorsement of the checks, that she did not want to do so in part to avoid foreclosing the possibility of the district court awarding her "mortgageable property" instead of cash. If Bogosian did not in fact reject the checks in good faith,9 but rather simply because she wanted the cash in  ____________________ 9. F&M is correct, of course, in stating that good faith is not a defense to a breach-of-contract claim. See Restatement ___ ___________ (Second) of Contracts 11, introductory note (1979). We do _____________________ not hold that a good-faith belief that she did not have to assign the checks to F&M would absolve Bogosian of liability; rather, we hold that if Bogosian rejected the checks in good ________ faith -- i.e., for some legitimate reason not connected to a -15- 15 her hands rather than in F&M's coffers, then she may well have breached the covenant of good faith implicit in all contracts under Rhode Island law. See Crellin Technologies, ___ _____________________ Inc. v. Equipmentlease Corp., 18 F.3d 1, 10 (1st Cir. 1994) ____ ____________________ ("Rhode Island recognizes that virtually every contract contains an implied covenant of good faith and fair dealing between the parties."); Ide Farm & Stable, Inc. v. Cardi, 297 _______________________ _____ A.2d 643, 645 (R.I. 1972) (stating that purpose of implied covenant of good faith and fair dealing is "so that contractual objectives may be achieved"). We find, however, that a rational jury, presented with the evidence contained in the summary judgment record, could conclude that Bogosian rejected the checks for a legitimate reason, and therefore summaryjudgment onF&M'sbreach-of-contractclaim isinappropriate.10  ____________________ desire to keep the money herself and avoid the dictates of the assignment agreement -- then she has not breached the contract. 10. A rational jury might also conclude, of course, that Bogosian only had an aversion to receiving cash when it was going into F&M's pocket, as counsel for F&M put it at oral argument. The fact that Pliakas tried to negotiate a share of the $1 million for Bogosian, and Bogosian's argument to the district court that F&M should not have asserted a claim to the money when it knew that she needed the cash to pay other creditors, support this view. Divining Bogosian's true intent requires an assessment of her credibility, a task for the factfinder, not the court. We have also considered, and found meritless, F&M's assertion that comments by Bogosian's attorney in a related interpleader action estops her from arguing now that the proffered $1 million were not "proceeds." In the course of arguing against the interpleading of WRC's $1 million, Bogosian's attorney told the court that the funds were "proceeds" of the valuation litigation and their disposition -16- 16 Although we remand for trial on the issue of liability, we leave intact that part of the district court's summary judgment ruling establishing the amount Bogosian owed F&M as of the date of alleged breach, plus interest. Bogosian argues that this would be inappropriate because F&M never specifically asked for "partial summary judgment" pursuant to Fed. R. Civ. P. 56(d). We know of no such requirement; Rule 56(d) states that a court, "[i]f on motion ______________ under this rule (Rule 56) judgment is not rendered upon the _______________ __________________________________ whole case[,] . . . shall if practicable" specify those facts __________ ____________________ that are without substantial controversy. F&M's pleadings and affidavits made clear that it was asserting that the legal fees and expenses detailed in its billing statements were fair and reasonable in light of the services it performed for Bogosian. Bogosian never contested the accuracy or truthfulness of any of those statements, nor did she adduce any expert testimony that the requested fees were excessive. Bogosian offered her own opinion that the fees charged for certain portions of the litigation were  ____________________ should be determined in that action. We do not understand his comments to amount to an assertion of rights by Bogosian to the money, and we therefore hold that Bogosian is not estopped from arguing that the funds were not in fact "proceeds" or "recoveries." -17- 17 excessive,11 but her generalized assertions are not enough to create a "substantial controversy" about the amount she is obligated to pay under her contract with F&M, assuming that she is found to have breached that contract. See Fed. R. ___ Civ. P. 56(e) ("When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."); see also Bennett v. Martin-Trigona, 686 F. ___ ____ _______ ______________ Supp. 6, 9 (D.D.C. 1988) (awarding summary judgment to plaintiff-attorney after defendant-client failed to provide evidence of specific errors in bills); cf. Pfeifer v. Sentry ___ _______ ______ Ins., 745 F. Supp. 1434, 1443 (E.D. Wis. 1990) (stating that ____ when amount of attorney fee is challenged, attorney has burden of proving reasonableness of fee, but opposing party has responsibility to state objections with particularity and clarity). This is not a fee-award case, where the court is called on to determine a reasonable attorney's fee in the  ____________________ 11. For example, Bogosian asserted that she was billed more than $200,000 for work concerning her "Section 8 partnerships" yet no lawsuit was ever filed. Bogosian never bothered to direct us (or the district court) to the specific billing entries that she claims represent this work, let alone those entries that she deems excessive. -18- 18 first instance; it is a contract case, and Bogosian's obligations to F&M are defined by that contract. See Laverty ___ _______ v. Pearlman, 654 A.2d 696, 703 (R.I. 1995) ("[W]hat a ________ plaintiff may be bound to pay and what an attorney is free to collect under a fee agreement are not necessarily measured by the 'reasonable attorney's fee' that a defendant must pay pursuant to a court order." (quoting Venegas v. Mitchell, 495 _______ ________ U.S. 82, 90 (1990)); see also A Sealed Case, 890 F.2d 15, 17 ___ ____ _____________ (7th Cir. 1989) ("Fees are matters of contract, and unless the fee is so exorbitant that its collection offends [professional conduct rules], disputes about that are resolved under that body of law."). A $1 million fee for extensive work performed in a number of bitterly-fought lawsuits is not on its face exorbitant, and Bogosian has utterly failed to provide evidence that any of the claimed fees and expenses were in fact not incurred, are unreasonable, or exorbitant. Thus, the amount owed to F&M on its breach-of-contract claim is not in substantial controversy and is deemed established upon remand.12 C. Bogosian's Counterclaims ____________________________ Bogosian's counterclaim, by the district court's count, alleged thirty-four instances of malpractice or breach-of-contract by F&M. Flanders & Medeiros, Inc. v. __________________________  ____________________ 12. Subject, of course, to appropriate recalculation of interest and fees incurred under the contract subsequent to the district court's summary judgment order. -19- 19 Bogosian, 868 F. Supp. at 417 n.4 (D.R.I. 1994).13 The ________ district court granted F&M summary judgment on each claim because Bogosian had failed to adduce competent evidence, in the form of expert testimony, on the standard of care and scope of duty to which F&M should be held, or on damages. Id. Bogosian now argues that the district court erred ___ because (1) merely identifying an expert witness who would ___________  ____________________ 13. The district court's characterization of the allegations, with which we largely agree, was as follows: (a) F&M's failure to obtain sufficient interim relief in the WRC litigation; (b) F&M's failure to properly supervise expert witness Eric Berenson in the appraisal proceeding before the Special Master; (c) F&M's failure to insist on certified income and expense statements from WRC in the valuation proceeding; (d) F&M's failure to object to the Special Master's report on the basis of, inter alia, the appropriateness of the comparables relied upon by the Special Master to arrive at the value of certain real estate, his valuation of WRC's management business based upon two years' management contracts, and the issue of whether there was a waterway on another site; (e) F&M's withdrawal of its representation of Bogosian in the WRC litigation, and its failure to bring suit to enjoin Bogosian's brother from entering into unauthorized management contracts; (f) F&M's numerous failures to take action in relation to the two receiverships; and (g) F&M's failure to take action to have Bogosian's brother declared incapacitated and terminated as a general partner of the Section 8 limited partnerships. 886 F. Supp. at 417 n.4. -20- 20 testify in support of her claims was enough to survive a summary judgment motion,14 and (2) certain of her claims did not require expert testimony. Bogosian's first argument is plainly wrong. We stated in Focus Inv. Assocs. v. American Title Ins. Co., 992 __________________ _______________________ F.2d 1231, 1239 (1st Cir. 1993), that under Rhode Island law, "a legal malpractice plaintiff must present expert testimony establishing the appropriate standard of care unless the attorney's lack of care and skill is so obvious that the trier of fact can resolve the issue as a matter of common knowledge." We further explained that claims that "fall into the 'common knowledge' category are those where the negligence is 'clear and palpable,' or where no analysis of legal expertise is involved." Id. Virtually all of ___ Bogosian's claims require analysis of legal expertise, and therefore the mere identification of an expert expected to ______________ testify at trial would in no way demonstrate the standard of care applicable to F&M, an essential element of her case.  ____________________ 14. Bogosian filed a supplemental response to F&M's interrogatories identifying an expert witness prepared to testify on her behalf on February 15, 1994, almost five months after the September 24, 1993, discovery closure date and only a week before the summary judgment motions were argued before a magistrate-judge. The supplemental response contained no indication of the nature or basis of the expert's expected testimony other than to say that he would testify "in support of" Bogosian's defenses and counterclaims. -21- 21 Summary judgment is "mandate[d] . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The ______________ _______ moving party discharges his or her initial burden of "showing" the absence of a genuine issue concerning any material fact by pointing out to the district court "that there is an absence of evidence to support the nonmoving party's case." Id. at 325. F&M discharged this burden by ___ pointing in its summary judgment motion to Bogosian's absence of expert testimony in support of her counterclaims.15 Therefore, summary judgment was appropriate as to all of her claims that required the analysis of legal expertise.16  ____________________ 15. Bogosian argues that F&M only complained of her failure to identify an expert witness, and thus she was under no ________ obligation to do any more than that. F&M's motion for summary judgment, however, clearly states that Bogosian "must present expert testimony" and that she "has no expert testimony to support this claim." Stating that Bogosian had not yet even identified an expert witness was simply a stronger way of stating that she had no hope of bearing her burden of proof at trial. 16. Bogosian also argues that the district court abused its discretion in denying her request, pursuant to Fed. R. Civ. P. 56(f), for more time to produce expert witness affidavits. She bases this argument on the notion that the requirement that she adduce expert testimony to survive summary judgment was a "new rule" dreamed up by the magistrate-judge at the summary judgment hearing, and that its application to her case constitutes an abuse of discretion. This argument is legal poppycock; the requirement of expert testimony in proving most types of malpractice claims has been so widely adopted that "it may even be malpractice to litigate a legal -22- 22 Bogosian also argues that not all of her claims were of the type that required expert testimony. For example, she argues that the district court failed to realize that her allegation that F&M breached its duty of loyalty to Bogosian when it placed its own interest in getting paid ahead of Bogosian's possible interest in receiving a property distribution rather than cash, adequately limned a breach-of- fiduciary duty claim. Similarly, she argues that her allegation that F&M withdrew from ongoing litigation in violation of their contract states a breach-of-contract claim (assuming that the contract contains an implied term to continue representation until the conclusion of the litigation) that is completely distinct from F&M's duty to perform to the appropriate standard of care. These claims, Bogosian argues, as well as a smattering of similar allegations contained in her counterclaim, require no expert testimony because they do not require the analysis of legal expertise. We need not answer the question Bogosian poses, because even assuming arguendo that Bogosian has adequately ________ stated claims that do not require expert testimony, she has ___ failed to introduce adequate evidence of damages to support any of her claims. See 1 Ronald E. Mallen & Jeffrey M. ___ ___  ____________________ malpractice case without expert testimony." Wilburn Brewer, Jr., Expert Witness Testimony in Legal Malpractice Cases, 47 ____________________________________________________ S.C. L. Rev. 727, 733 (1994).  -23- 23 Smith, Legal Malpractice 16.1 (1989) ("Since the objective _________________ of a legal malpractice suit is usually the recovery of monetary compensation for an injury, pleading and proof of damages are essential to a cause of action."); cf. Moores v. ___ ______ Greenberg, 834 F.2d 1105, 1111 (1st Cir. 1987) ("Whatever _________ form a legal malpractice action takes, the plaintiff has the burden of introducing evidence to justify an award of consequential damages."). In her Counterclaim, Bogosian raised the specter of having to hire additional lawyers to duplicate work already performed by her abandoning lawyers, yet she never provides further evidence of such costs. In answering F&M's interrogatories regarding the nature and scope of her damages, Bogosian repeatedly answered (or incorporated by reference) that "[a]n expert will assess the value of damages sustained from Flanders & Medeiros' breach upon obtaining further discovery." Such an assessment was never forthcoming. As for F&M's placing its own interest in getting paid ahead of Bogosian's possible interest in obtaining a property distribution for the full amount of her stock's value, the $1 million was never received by F&M, and the record contains no evidence that the possibility of Bogosian receiving a distribution entirely in property has been diminished at all.17 Thus, Bogosian had not adduced  ____________________ 17. The checks eventually expired; WRC initiated an interpleader action in the district court to determine the rights of various creditors of Bogosian, including F&M, to -24- 24 competent evidence sufficient to prove an essential element of her claim, namely, that these alleged breaches by F&M -- whether or not proof thereof would require expert testimony - - have in fact damaged her. Therefore, summary judgment must be granted for F&M on these claims. III. III. ____ For the foregoing reasons, the decision of the district court is reversed in part, affirmed in part, and __________________________________________ remanded for further proceedings consistent with this _____________________________________________________________ opinion. _______  ____________________ funds WRC expected to pay to her. -25- 25