USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 97-2055
No. 97-2411
No. 98-1159

 ELIZABETH V. BOGOSIAN, ET AL.,

 Plaintiffs, Appellees,

 v.

 JAMES H. WOLOOHOJIAN, HARRY J. WOLOOHOJIAN and
 WOLOOHOJIAN REALTY CORPORATION,

 Defendants, Appellants.
 ___________________

No. 98-1164

 WOLOOHOJIAN REALTY CORPORATION,

 Plaintiff, Appellee,

 v.

 ELIZABETH V. BOGOSIAN, ET AL.,

 Defendants, Appellees.
 __________

 RHODE ISLAND HOSPITAL TRUST NATIONAL BANK,

 Defendant, Appellant.
_________________ ___

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF RHODE ISLAND

 [Hon. Francis J. Boyle, Senior U.S. District Judge]
 [Hon. Ronald R. Lagueux, U.S. District Judge]

 Before

 Boudin, Circuit Judge,
 
Wellford, Senior Circuit Judge,

and Lynch, Circuit Judge.

 William R. Grimm with whom Hinckley, Allen & Snyder was on
consolidated brief for Woloohojian Realty Corporation.
 Richard W. MacAdams with whom Paul W. Goodale and MacAdams &
Wieck Incorporated were on consolidated brief for Rhode Island
Hospital Trust National Bank.
 Charles D. Ray with whom John W. Cannavino and Cummings &
Lockwood were on consolidated brief for Elizabeth V. Bogosian.

September 11, 1998

 
 
 BOUDIN, Circuit Judge. This case principally concerns
the amount owed to Elizabeth V. Bogosian for her shares in
Woloohojian Realty Corporation ("WRC"). What could have been a
relatively simple suit has been complicated by intervening actions
by Bogosian's creditors, an eventual interpleader suit, and a
number of appeals to this court. At the present time, the original
parties have been litigating for over ten years.
 I. THE FACTS AND PROCEEDINGS
 The Stock Buyout Case. On January 19, 1989, Elizabeth V.
Bogosian filed this action under R.I. Gen. Laws 7-1.1-90 to
dissolve WRC, a corporation that she owned in equal parts with her
two brothers. The action was brought as a diversity suit in the
federal district court. The defendants were the corporation and
Bogosian's two brothers.
 On February 16, 1989, WRC elected to purchase Bogosian's
shares under R.I. Gen. Laws 7-1.1-90.1. Under the Rhode Island
statute, Bogosian is entitled to the fair value of her shares as of
January 19, 1989, plus interest from the date of WRC's election to
buy the shares until the date of payment in full for her shares. 
As of the valuation date, WRC's assets consisted substantially of
twenty-one parcels of real estate, including commercial buildings,
residential apartments, and undeveloped land.
 The case came before Judge Boyle. Judge Boyle's first
action was to provide interim relief to Bogosian. To secure her
claim, he ordered WRC to give Bogosian a $10 million mortgage on a
piece of property referred to as the Jamestown apartments. And, as
advances on her ultimate recovery, Judge Boyle ordered WRC to make
her an interim $100,000 payment in cash, and to pay her $10,000
monthly until the entry of a final judgment from which no appeal
was taken. In July 1990, Judge Boyle appointed a special master
to value the property and much of the next two years appears to
have been spent in this exercise. In August 1992, the special
master presented his initial report, which valued the corporation
at $13,240,404. Both parties objected to the report, and it was
sent back for adjustments.
 Later in 1992, WRC sold a piece of property at Routes 2
and 117 in Warwick, Rhode Island. With the profits, it issued
checks payable to Bogosian for a total of $1,000,000 and delivered
them to Flanders + Medeiros ("F+M"), Bogosian's then-counsel, as a
partial payment for her stock. At least one objective was to stem
the accrual of interest on WRC's debt to Bogosian. Rhode Island's
stock buyout statute expressly provides that the "petitioner will
be entitled to interest on the purchase price of the shares from
the date of the filing of the election to purchase the shares." 
R.I. Gen. Laws 7-1.1-90.1. When the checks were sent, interest
had already been accruing under the statute for almost four years.
 A dispute then arose between Bogosian and F+M over the
checks because Bogosian had agreed with F+M that the first proceeds
of the suit would be used to pay the money Bogosian owed the
lawyers for fees. Judge Boyle later conjectured that the true
reason WRC sent the checks was to provoke this controversy,
although there does not appear to be actual evidence to support
this theory. The resulting litigation reached this court as
Flanders + Medeiros, Inc. v. Bogosian, 65 F.3d 198 (1st Cir. 1995). 
The checks at issue were never cashed, but were never returned to
WRC.
 While the proceedings continued in the stock buyout case,
there were new developments involving Bogosian, WRC, and Bogosian's
creditors. In April 1993, the IRS served a notice of levy on WRC
for approximately $216,000 owed to it by Bogosian. Faced with this
levy and the perceived possibility that it would face double
liability if it paid money out to Bogosian, WRC filed a motion with
Judge Boyle seeking permission to file an interpleader action and
to place all future payments to Bogosian in the registry of the
district court rather than paying them directly to Bogosian.
 At about the same time, Bogosian filed a motion for a
protective order from the court, declaring that the $10,000 monthly
payments would be exempt from liens and levies and restraining WRC
from contacting any of Bogosian's creditors. WRC objected to the
motion and it was referred to Magistrate Judge Boudewyns. The
magistrate judge denied Bogosian's motion, and ruled that WRC
should make the monthly payments into an escrow account held by its
attorneys, pending Judge Boyle's determination of WRC's motion for
interpleader. Ultimately, WRC would place a total of $100,000 and
$160,000 into two escrow accounts under this order.
 More liens followed the IRS levy, including attorney's
liens asserted by F+M and R. Daniel Prentiss (another counsel to
Bogosian) in April and an attorney's lien asserted by Tillinghast,
Collins, and Graham (yet another of Bogosian's lawyers). Prompted
by these liens and by the fact that Judge Boyle still had not ruled
on the interpleader motion, WRC filed a separate interpleader
action on June 25, 1993. In the interpleader action, WRC asked to
make all payments of any sum due (or to become due) to Bogosian
into the registry of the district court, including the amounts held
in the escrow accounts.
 The new interpleader case was assigned to Judge Pettine
in July 1993, and to Magistrate Judge Boudewyns, but in October it
was transferred to Judge Boyle who again assigned it to Magistrate
Judge Boudewyns for settlement purposes. In March 1994, WRC sought
permission in the interpleader action to put money into the
registry. Over the next two months it made deposits of $95,000 and
$1 million into the account. On June 2, 1994, the magistrate judge
authorized the deposits that had been made. These deposits did not
include the required $10,000 monthly payments, but were additional
amounts paid by WRC, apparently in another attempt to stem the
accrual of interest in the stock buyout case.
 In September 1994, the special master produced his final
report, valuing WRC at $14,705,404, a third of which (Bogosian's
share) would be $4,901,801. Both parties objected, but in April
1995, Judge Boyle affirmed the report, subject to further hearings
before him on two issues: (1) WRC's claim that the value of the
corporation should be discounted by what WRC referred to as
discounted tax liabilities--the amount that they would have to pay
in capital gains taxes if they sold (or made a taxable transfer of)
properties that had been held for a long time and had increased in
value; and (2) the proper rate to be fixed for prejudgment interest
owed to Bogosian. Judge Boyle did say, however, that the rate
applied would be compound, rather than simple, interest. 
 The Bank Claims. At about this point in the chronology,
another set of federal proceedings in the same district court
intersected with the stock buyout case. These proceedings had
their origin in two district court judgments obtained against
Bogosian by Rhode Island Hospital Trust National Bank ("the Bank")
--one from February 18, 1994, for $281,748 plus interest and costs,
and one from October 28, 1994, for $1,107,295 plus interest and
costs. These judgments arose from a loan the Bank made to a
corporation owned by Bogosian which was guaranteed by Bogosian and
another loan made to Bogosian individually. When the loans were
not paid back, the Bank sued Bogosian and obtained judgments. The
cases ("the Bank Case") were originally assigned to Judge Pettine,
but would be transferred to Chief Judge Lagueux in September 1997,
after Judge Pettine's retirement.
 The Bank obtained two writs of execution against
Bogosian, but it became apparent that efforts to recover from her
directly would be futile. Therefore, the bank obtained from the
district court a writ of trustee process. This writ allowed the
Bank to levy on any property belonging to Bogosian that was in the
hands of third parties, up to the amount owed to the Bank by
Bogosian. Thus, WRC was required to account to the Bank for any
property in its hands that belonged to Bogosian. The Bank served
the writ on WRC in May 1995.
 Fed. R. Civ. P. 69 provides that procedure on the
execution of judgments is to be in accordance with the practice and
procedure of the state in which the district court is held. Under
Rhode Island law, certain types of property are exempt from
attachment. R.I. Gen. Laws 9-26-4. These include things like
wearing apparel, books in family use, and tools of the debtor's
occupation. In addition, there is an implied exemption for
property whose seizure would be against the policy of the law. The
debtor must claim any exemptions that apply.
 After the Bank served its writ on WRC, a magistrate judge
conducted a hearing on June 6, 1995, to determine if there should
be any exemptions in favor of Bogosian. Notice of this hearing was
sent to both Bogosian and her counsel. Later, Bogosian claimed
that she did not receive the notice, but it appears that she never
claimed that her attorney did not receive notice. At any rate,
neither Bogosian nor her counsel attended the hearing, and the
magistrate found that there was no property that should be exempted
from the writ.
 In June 1995, WRC asked Judge Boyle--in light of the writ
directing it to hold Bogosian's property for the Bank--to modify
earlier orders he had entered directing that the $10,000 monthly
subsistence payments be made solely to Bogosian herself. In July
1995, Judge Boyle denied WRC's motion. On August 8, 1995, Judge
Boyle issued an order that WRC release to Bogosian the money held
in the escrow accounts, finding that the magistrate judge had not
had the power to order deposits into those accounts some two years
before. WRC appealed both of these orders to the First Circuit.
 In April 1996, this court vacated Judge Boyle's July 1995
order and remanded it for further consideration. Bogosian v.
Woloohojian, 86 F.3d 1146 (table), 1996 WL 202226 (1st Cir. Apr.
26, 1996). Although the court did not decide whether WRC was in
fact subject to conflicting directives from two district court
judges, it noted the serious problems inherent in even the
appearance of conflict. It directed the district court to resolve
the issue, either by establishing that the orders did not conflict
or by harmonizing WRC's obligations to the various claimants. The
court suggested either acting on the interpleader action or
consolidating the cases under one judge. Both of these were
eventually done, but not until more than a year later.
 Final proceedings. In 1996, Judge Boyle held hearings
over several months to resolve the two issues he had reserved in
his April 1995 order otherwise approving the special master's
report as to the amount owed by WRC to Bogosian for her stock. The
hearings involved witnesses from both sides as well as an expert
witness appointed by the court.
 Judge Boyle issued his final decision in the stock buyout
case on July 31, 1997. This order provided: "WRC shall pay the
plaintiff, and only to the plaintiff personally and individually$4,901,801.00 plus 11% interest on the balance due and owing from
time to time, compounded monthly from February 16, 1989 until the
plaintiff has been paid in full for all principle and interest."
(emphasis in original). The order did not address any potential
exposure on the part of WRC to liability to Bogosian's creditors in
addition to their liability to Bogosian.
 In November 1997, Judge Boyle denied WRC's motion for a
new trial, to amend findings of fact, or for reconsideration, and
designated his July 31, 1997, order as final. On January 2, 1998,
he denied another motion for new trial (this one based on alleged
newly discovered evidence) and ordered WRC to make payments
directly to Bogosian, without regard to the claims by Bogosian's
creditors.
 WRC now appeals from three of the district court orders:
the July 31, 1997, order finalizing the share price, imposing
compound interest, and ordering payments solely to Bogosian; the
November 3, 1997, order denying WRC's motion for new trial, to
amend findings of fact and/or for reconsideration; and the January
2, 1998, order denying WRC's motion for new trial or to grant
relief from judgment based on newly discovered evidence and
ordering payments directly to Bogosian.
 While the stock buyout case was winding toward an end,
the Bank's efforts to obtain the proceeds were also continuing. 
Shortly after Judge Boyle's final decision in the stock buyout
case, the Bank, on August 13, 1997, filed a motion in the Bank case
seeking to compel WRC to deliver all property it held that belonged
to Bogosian to the Bank. After the Bank case was reassigned from
Judge Pettine to Chief Judge Lagueux in September 1997, he heard
the motion on October 30, 1997. At that hearing, he ordered that
all the money owed to Bogosian by WRC be paid into the pending
interpleader action, and stated that all money in that action would
then be paid to creditors before any money would go to Bogosian.
 At the time of the October 1997 hearing, WRC's
interpleader case had been assigned to Chief Judge Lagueux (as of
August, 1997), who had then reassigned it to Judge Boyle on October
15, 1997. However, at the hearing, Chief Judge Lagueux announced
that he would keep control of the interpleader case. About a month
later, Chief Judge Lagueux announced that he intended to
consolidate the two cases (the interpleader and the stock buyout
case). On November 26, 1997, he did consolidate the cases, with
the proviso that Judge Boyle would decide all pending motions in
the stock buyout case.
 In December 1997, the Bank filed an answer in the
interpleader action (now consolidated with the stock buyout case)
so that its right to the money owed Bogosian by WRC could be
determined along with the rights of her former attorneys (numbering
some half-dozen firms at this time) and the IRS. The Bank now
appeals, challenging Judge Boyle's direction that WRC make payments
directly to Bogosian, on the grounds that it conflicts with both
the interpleader action and their levy on Bogosian's property.
 II. DISCUSSION
 We begin with a number of specific arguments made by WRC
concerning the valuation of Bogosian's share in WRC, including
issues of the proper rate of prejudgment interest to be applied. 
This opinion then turns to the claim made jointly by WRC and the
Bank, concerning Judge Boyle's requirement that payments be made by
WRC directly to Bogosian. Finally, we address several
miscellaneous issues raised by WRC in its appeal.
 Deferred Tax Liabilities. Many of the properties held by
WRC at the valuation date had been owned by WRC for some time, and
had values much higher than the prices originally paid for them. 
Thus, if WRC were to sell (or make a taxable transfer of) any of
these properties, it would incur significant capital gains tax
liabilities based on the difference between the amount the property
sold for and the original price of each property. Judge Boyle held
that these "potential liabilities" could not be taken into account
in the valuation of WRC.
 Judge Boyle's decision would be correct if there were no
plans to sell any of the properties at any time in the foreseeable
future, because none of the liabilities would be incurred unless
the properties were sold. However, WRC took the position that its
obligation to pay Bogosian for her stock compelled it to make
property sales. The amount of taxes paid on any sale would, in
effect, lower the price WRC would receive for these properties. In
principle, the corporation was worth less because of the need to
make this forced liquidation, regardless of whether the liquidation
were required to pay Bogosian or anyone else with a large immediate
claim.
 Judge Boyle gave several reasons for his determination
not to consider the tax liability, two of which are invoked by
Bogosian on appeal. The first was that WRC did not have to sell
property to pay Bogosian, and therefore would not necessarily have
to pay the liabilities claimed. Bogosian points to two pieces of
evidence that borrowing would be possible: the court's expert's
report, which listed a number of possible ways for WRC to pay
Bogosian, and testimony by one of WRC's experts that WRC would not
default on its debt to Bogosian, partly because it could borrow
money.
 However, the court's expert testified at the hearing that
he did not have enough information to form an opinion on WRC's
actual borrowing capacity, thus contradicting his report; and WRC's
expert does not appear to have testified that WRC could borrow all
of the money necessary to pay Bogosian. WRC presented evidence
that its cash flow would not support borrowing over approximately
three million dollars; and its debt to Bogosian, with accumulating
interest, greatly exceeded this figure. This evidence, combined
with the fact that Bogosian points to no evidence that contradicts
it, persuades us that Judge Boyle clearly erred in finding that WRC
could have borrowed the money to pay Bogosian without selling any
property.
 The second reason given by Judge Boyle and argued by
Bogosian on appeal for disallowing the liabilities is that WRC
could have used a tax-free "section 355 split-off" transaction to
transfer assets to Bogosian. See 26 U.S.C. 355. In a section
355 split-off, which will be tax free if certain conditions are
met, a corporation transfers to a current shareholder stock or
securities in a subsidiary corporation (to which some of the
corporate assets could have been transferred). If, before Bogosian
filed for dissolution, WRC had placed one-third of its assets into
a newly-created subsidiary, it might have been able to "split-off"
Bogosian by transferring the ownership of that subsidiary to her in
exchange for her shares in WRC.
 The main difficulty with using section 355 in this case
is that a split-off transaction will be tax-free only if undertaken
with a current shareholder. Although the issue is not entirely
clear, the language of the Rhode Island statute indicates that
Bogosian ceased to be a shareholder on the day WRC elected to
purchase her shares rather than dissolve the corporation. This
interpretation is consistent with practice in the buyout
proceeding, whereby the former shareholder ceases to receive
dividends as of the election date, but does receive interest from
that date until she is paid in full for her shares.
 In other words, the use of a section 355 split off would
necessarily have required anticipation by WRC, and probably
agreement by Bogosian, before the election to purchase made by WRC
in February 1989, almost a decade before the valuation itself. 
Such prescience cannot fairly be required, and indeed, Bogosian's
brief scarcely argues that WRC should have anticipated this
solution in 1989. Accordingly, the possibility of such a
transaction at the outset--and it is only a possibility--does not
answer the need to take account of the taxes on property sales that
were and are required to pay Bogosian for her stock.
 One other reason was given by Judge Boyle (but is not
pursued by Bogosian on appeal) for refusing to consider WRC's tax
liability in assessing the value of its stock. Judge Boyle said
that Bogosian would pay personal taxes on the proceeds received
from WRC, and that she should not pay the corporation's taxes as
well. But individuals who use the corporate form to accumulate
earnings or gains are normally subject to double taxation: they
suffer indirectly whatever taxes are paid by the corporation and
then are liable to personal tax whenever the corporation
distributes earnings or the shareholder realizes gain on the sale
of his or her shares.
 Judge Boyle's reasoning may also have been based on the
fact that the sale of Bogosian's stock was triggered by WRC's
election to purchase her stock rather than dissolve the
corporation. However, dissolution is a realization event for both
the corporation and the shareholder (the corporation would be taxed
on all of its gains on the sale of its property, and Bogosian would
then be taxed on the distribution to her) as much as is the sale of
stock. See I.R.C. 331, 336. Bogosian triggered the realization
herself, and is in no position to avoid the full consequences of
her choice.
 WRC has filed a plan to finance its purchase of shares
from Bogosian which included the sale of one property, the sale or
transfer to Bogosian of two other specific properties (either sale
or transfer would be a taxable event for WRC), the refinancing of
one property, and borrowing on such other properties as necessary
to pay Bogosian. The valuation of WRC must include the expected tax
liability that will be incurred on the three specifically planned
sales and transfers and Bogosian will effectively shoulder one-
third of the reduction. Any other decision would falsely inflate
the value of WRC.
 The Interest Award. Judge Boyle awarded Bogosian 11
percent interest on the balance due to her, compounded monthly from
February 16, 1989. WRC challenges the interest award on two
grounds. First, it claims that Rhode Island law does not allow an
award of compound interest for actions under R.I. Gen. Laws 7-1.1-
90.1. Second, it argues that the award of 11 percent interest
compounded monthly was too high for the period at issue. As in all
diversity cases, we look to state law for the law on prejudgment
interest. See Roy v. Star Chopper Co., Inc., 584 F.2d 1124, 1135
(1st Cir. 1978).
 Although our conclusion is not entirely free from doubt,
we hold that Rhode Island law does not at present allow an award of
compound interest in this situation (or most others), although it
conceivably might do so in the future. This conclusion, which we
reach as a matter of law, is consistent with our practice of not
anticipating changes in state law in advance of the state courts.
See Martel v. Stafford, 992 F.2d 1244, 1247 (1st Cir. 1993); Porterv. Nutter, 913 F.2d 37, 40-41 (1st Cir. 1990).
 Judge Boyle based his award of compound interest in large
part on his judgment that it was necessary to fulfill the basic
purpose for awarding prejudgment interest in this type of
situation. He stated that the plaintiff would not be fairly
compensated for the use of her money unless she received compound
interest, and that the buyout statute's provision for interest must
therefore allow compound interest. Clearly, if one's money is held
for a number of years, one loses not only the interest one could
make on that money each year, but also the profits that could be
made from investing that interest each year.
 As a matter of policy, there is much to be said for Judge
Boyle's approach. Certainly, it is a realistic assessment of the
economic consequences for both sides of the case. Given the stock
buyout election, Bogosian effectively ceased to be a shareholder
under Rhode Island law as of the day she filed for dissolution,
received no dividends thereafter, and was deprived not only of
immediate payment but therefore also of the income she would have
earned thereafter from investing the payment. Conversely, WRC has
continued to be able to use Bogosian's stake, retaining for itself
the "earnings" and able to "reinvest" those earnings itself.
 The difficulty is that the Rhode Island courts, like
those of many other states, have historically been hostile to the
awarding of prejudgment interest, and, in particular, compound
prejudgment interest. Such interest was not allowed at all at
common law. See Dobbs, Law of Remedies 3.6(1) (2d ed. 1993). 
Even after states began to allow prejudgment interest, it was
generally only available where the amount of damages was fixed and
ascertainable in advance. Cf. Restatement, Second, Contracts, 
354, comment a (1981). Even in liquidated damages cases, only
simple (not compound) interest was allowed. See id.; Dobbs, supra,
3.6(4).
 Today, in most states, prejudgment interest commonly is
only allowed pursuant to statute. See Dobbs, supra, 3.6(1). The
Rhode Island statute that provides generally for prejudgment
interest--but does not apply here--specifies that the interest is
to be added by the clerk at the rate of twelve percent per annum
(i.e. simple interest). See R.I. Gen. Laws 9-21-10. The one
explicit exception to the general rule of simple interest in Rhode
Island proceedings is for certain eminent domain proceedings, for
which a statute expressly allows compound prejudgment interest. 
See R.I. Gen. Laws 37-6-23. Rhode Island courts consider
prejudgment interest statutes to be statutes in derogation of the
common law, and construe them strictly. See Clark-Fitzpatrick,
Inc./Franki Foundation Co. v. Gill, 652 A.2d 440, 451 (R.I. 1994).
 R.I. Gen. Laws 7-1.1-90.1 is one of a number of statutes
that refer to an award of interest from a certain date, with no
indication as to whether interest should be compound or simple. 
But prior to Judge Boyle's decision, it does not appear that any
Rhode Island court had allowed compound prejudgment interest under
any statute that did not specifically authorize compound interest--
prior to Judge Boyle's decision to award compound interest. 
Indeed, the Rhode Island Supreme Court appears to disfavor compound
interest. See Atlantic Refining Co. v. Director of Public Works,
244 A.2d 853 (R.I. 1968).
 Accordingly, we conclude that Rhode Island courts would
not allow an award of compound prejudgment interest under R.I. Gen.
Laws 7-1.1-90.1. As simple interest, the 11 percent award can
stand despite WRC's claim that it is itself excessive. But 11
percent is close enough to the boundary of reasonableness that we
do not think that the change from compound to simple interest is
enough to justify raising the rate any higher. In addition,
Bogosian has not requested such a recalculation. Therefore the
rate of 11 percent per annum simple interest will stand.
 Interest Abatements. Perhaps the most difficult issue in
this case concerns the district court's refusal to treat three
attempted or actual payments by WRC as cutting off the accrual of
interest as to those amounts. Each of these claimed interest
abatements comprises a different story. However, before turning to
those stories, we address Judge Boyle's general rationale for not
allowing any of the interest abatements.
 Judge Boyle based his disallowance of the interest
abatements on the fact that he had not approved the payments at
issue. The Rhode Island statute gives the judge general authority,
after determining the fair value of the stock to
 set forth in its order directing that the
 stock be purchased, the purchase price and the
 time within which the payment shall be made,
 and may decree such other terms and conditions
 of sale as it determines to be appropriate,
 including payment of the purchase price in
 installments extending over a period of time.

R.I. Gen. Laws 7-1.1-90.1. There is no claim that Judge Boyle
barred the prejudgment payments before they were made. Absent such
an order (whose validity we need not decide), we see no legal basis
for Judge Boyle's assumption that the court's prior permission was
required.
 Although the issue is not litigated often, it is a
general rule that interest will not accrue after a valid tender. 
See Garfinkle v. Chestnut Hill Mortgage Corp., 679 F.2d 276, 278
n.3 (1st Cir. 1982); see also Illini FS, Inc. v. Myerscough, 484
N.E.2d 1385, 1390 (Ill. App.3d 1985) (partial payment toward
satisfaction of a judgment stopped the further accrual of interest
on all but the unpaid portion of the debt). In addition, there is
no evident policy reason why a debtor should not be able to cut off
interest by tendering a portion of the debt to the creditor, who
will then enjoy the use of the money himself.
 Of the three payments by WRC, the easiest of the three to
resolve is the $1,095,000 paid by WRC into the district court
registry in April and May 1994 under circumstances already
described. WRC completely gave up control of the money, and when
the money is paid out of the registry, the interest will follow the
principal. The general rule is that money paid into the registry
of a court will stop the running of interest. See, e.g., Wm. A.
Smith Contracting Co. v. West Central Texas Municipal Water
District, 344 F.2d 470, 475 (5th Cir. 1965); Beaudry v. Favreau,
114 A.2d 666, 669 (N.H. 1955).
 Bogosian does not directly dispute the general rule but
repeats Judge Boyle's assertion that his prior permission was
required, an argument we have already rejected. Bogosian also
argues that the money put into the registry was the "same" money
WRC tried to pay her earlier by sending her checks totaling one
million dollars through her law firm. Since the money paid into
the registry was in fact paid by WRC and accepted by the registry,
we will consider the "duplication" argument in connection with the
uncashed checks.
 We reject WRC's second claimed abatement for $2,300,000
that it claims it would earlier have paid Bogosian if it had been
allowed to refinance the Jamestown apartments in 1991. The reason
WRC could not carry through its plan was Bogosian's objection to a
substitution of collateral (she held a second mortgage on the
Jamestown apartments, which she would have had to give up or
subordinate in the refinancing). Although WRC's offer of over $2
million in cash and a first mortgage on one of two other pieces of
property may have been reasonable, we will not second guess the
district court's decision that Bogosian could retain the security
in the Jamestown apartments given to her by court order.
 The third claim--that WRC should receive an abatement for
the checks totaling $1 million dollars that were sent by WRC to
Bogosian through her then-counsel F+M but were never cashed--is the
most difficult issue to resolve. Shortly after the checks were
received by F+M, Bogosian informed F+M that she did not want to
accept the checks because she still hoped to receive most of her
share of WRC in the form of property. However, F+M did not return
the checks to WRC, and Bogosian and F+M began negotiating over the
money the checks represented. This dispute eventually ended up in
federal court, but the checks were still neither cashed nor
returned, and apparently stayed in the possession of F+M until they
were subpoenaed in the stock buyout case.
 Bogosian never informed WRC that she intended to reject
the checks, or that she intended never to cash them. Since a valid
tender does stop the accrual of interest, it was obviously bad
strategy merely to hold the checks, failing either to deposit them
or to reject the tender (if possible). If Bogosian's only argument
was that her lawyers acted inappropriately, it would not be fair to
charge this to WRC, and WRC would be entitled to an interest
abatement.
 However, Bogosian also argues that WRC should not receive
credit for this payment because this same money was later used to
make the later payments into the registry. In fact, WRC did know
that there was a controversy between F+M and Bogosian, and that the
checks had not been cashed in timely fashion, and WRC did withdraw
the money in the account apparently about a month after the checks
were delivered, although it did ensure that the bank would continue
to honor checks drawn on the account for a number of months. By
the time the overdraft protection had expired, it must have been
clear that the checks simply were not going to be cashed. 
 We conclude that WRC is entitled to an interest abatement
from the time of the delivery of the checks to the time that the
overdraft protection expired. As to the period following
expiration, our own inclination would be to deny any further
abatement as duplicative of the abatement due to the deposit in the
registry; but this is a choice within the equitable discretion of
the district court, which is free on remand to decide the issue
either way.
 Payments Directly to Bogosian. Both WRC and the Bank
object to the provision in Judge Boyle's July 31, 1997, order
(quoted above) that all payments in the stock buyout case be made
directly to Bogosian, without regard to the interpleader case or
any of the liens against the judgment. They argue that this
provision conflicts with the Bank's right to collect its judgments
under Rhode Island law and with Chief Judge Lagueux's orders in the
interpleader case that the proceeds be held pending decision in
that action. In addition, WRC argues that it may be exposed to
multiple liability if it is forced to pay directly to Bogosian
money on which there are outstanding liens.
 Bogosian says that Judge Boyle's order does not conflict
with Chief Judge Lagueux's order. We need not decide whether there
is a direct conflict between the district court orders or, if so,
which would prevail. Even if there was no conflict with another
district court order, it is our view that Judge Boyle did not have
the power to override the Bank's writ of trustee process (or other
liens obtained by Bogosian's creditors).
 We face here a purported conflict between provisions of
Rhode Island law--on one side, the Bank's trustee process obtained
under Rhode Island procedures, and on the other R.I. Gen. Laws 7-
1.1-90.1, which directs that the court "may decree such other terms
and conditions of sale as it determines to be appropriate,
including payment of the purchase price in installments extending
over a period of time." Bogosian has not pointed to any case
holding that this general language in the stock buyout statute
overrides any other provision of Rhode Island law, such as those
that govern priorities, liens, and attachments.
 In our view, the "appropriate" terms and conditions
provision is directed to the mechanics of the stock purchase and
payment as between the company and the former shareholder. It is
too big a leap to treat this terse and general provision as
allowing the judge in the stock buyout case to override an entire
body of state lien law protecting the interests of third parties in
other cases, merely because the proceeds happen to derive from an
award made by the judge. This is an untenable intention to impute
to the Rhode Island legislature based on an ancillary provision in
a narrowly focused statute regulating stock buyouts.
 Bogosian also argues that the $10,000 monthly payments
should be exempt from the liens against her because it was granted
by Judge Boyle for her sustenance. However, Bogosian did not
object to the writ of trustee process and did not attend the
hearing at which she could have asserted exemptions to the writ. 
As for Bogosian's claim of lack of personal notice, she could have
pursued it before the magistrate judge by a post-judgment motion
but may not collaterally attack the ruling in this court.
 Three remaining issues raised by WRC do not require much
discussion. WRC claims that the judge should have adjusted the
interest rate downward for Bogosian's intransigence in resisting a
settlement. Most of the evidence concerned a global settlement
which would have resolved not only the stock buyout case but also
other controversies between Bogosian and her brothers. Any
judgment about the reasonableness of the parties' positions on
settlement is peculiarly within the expert knowledge of the
district judge, and we decline to disturb that judgment here.
 We also reject WRC's claim that Judge Boyle was required
to recuse himself. The ground for the motion was Judge Boyle's
conduct of an informal settlement conference concerning the checks
sent by WRC to Bogosian through F+M which--according to WRC--led
him to acquire personal knowledge of disputed material facts in the
case. Judge Boyle was acting in a judicial capacity in seeking to
resolve a lawyer-client controversy affecting litigation before
him, namely, the stock buyout case. Accordingly, whatever knowledge
he acquired was not "personal" knowledge raising a recusal
question. In re Martinez-Catala, 129 F.3d 213, 219 (1st Cir.
1997).
 Finally, WRC says that it was entitled to a new trial in
the stock buyout case because of new evidence. The evidence here
is Bogosian's successful support for a lesser interest rate (8
percent simple interest) in another one of her many cases. It is
difficult to imagine that WRC seriously imagined that the district
court would reopen 10 years of litigation on this ground. In all
events, the refusal to do so was not an abuse of discretion.
 For the reasons stated above, we affirm the district
court's orders of November 3, 1997 and January 2, 1998, and affirm
in part and reverse in part the district court's order of July 31,
1997, and remand for further proceedings consistent with this
opinion.
 It is so ordered.