Elizabeth BOGOSIAN, Plaintiff,

v.

**WOLOOHOJIAN REALTY CORP., et al., Defendants.**

**C.A. No. 88–0373B.**

United States District Court,
D. Rhode Island.

July 31, 1997.

Eustace T. Pliakas, Tillinghast, Licht & Semonoff, Providence, RI, John W. Cannavino, William H. Bright, Jr., Charles D. Ray, Cummings & Lockwood, Hartford, CT, Michael J. Lepizzera, Providence, RI, for plaintiff Elizabeth V. Bogosian.

Everett Sammartino, United States Attorney's Office, Providence, RI, for I.R.S.

William Richard Grimm, Hinckley, Allen & Snyder, John H. Blish, William R. Landry, Blish & Cavanagh, Providence, RI, for defendants James H. Woloohojian, Harry J. Woloohojian and Woloohojian Realty Corp.

## OPINION

FRANCIS J. BOYLE, Senior District Judge.

Plaintiff Mrs. Bogosian, a minority shareholder in the defendant Woloohojian Realty Corporation, ("WRC"), petitioned on January 19, 1989 to dissolve the corporation. WRC was a family-owned real estate business incorporated in Rhode Island and was highly successful by the time this litigation began, with a value in the millions of dollars. Various disagreements among WRC's three shareholders left the plaintiff, owner of one-third of the corporation's capital stock, at odds with her two brothers, James and Harry Woloohojian, who each owned one-third of the stock. As a result of these disagreements, the plaintiff petitioned this court for dissolution of the corporation under R.I.Gen. Laws § 7–1.1–90 (1985). James and Harry Woloohojian also were named as defendants. Harry Woloohojian died during the course of this action, and his estate, represented by his wife and a bank as his executors, has been substituted as a party.

Rather than see the corporation dissolved and the liquidation proceeds distributed among the shareholders, the plaintiff's brothers, controlling shareholders of the closely-held corporation, preferred to have WRC continue as a functioning business entity. Rhode Island law allows a corporation subject to a shareholder suit for dissolution to avoid termination by purchasing the shares of the petitioning shareholder, "at a price equal to their fair value," without the shareholder's consent. R.I.Gen.Laws § 7–1.1–90.1 (1985). Therefore, WRC, through its officers Harry and James Woloohojian, elected to purchase the plaintiff's shares on February 16, 1989. A later attempt to "revoke" this election to purchase plaintiff's shares was rejected by this court as not authorized by law. Bogosian v. Woloohojian, 749 F.Supp. 396 (D.R.I.1990), aff'd 923 F.2d 898 (1st Cir. 1991).

In effect, the corporation's election to purchase plaintiff's shares terminated her rights as owner of the shares, except her right to payment of the shares' full and fair value from the corporation. The parties did not agree on how much WRC would have to pay the plaintiff for her shares, however, and determination of share value by the court became necessary, Rhode Island law incorporates the procedure for determining the value of a dissenting shareholder's stock in an appraisal proceeding as the method of determining "full and fair value." R.I.Gen.Laws § 7–1.1–90.1 (referring to R.I.Gen.Laws § 7–1.1–74 (1985)). Once the stock's value has been determined through this process, the court "shall set forth in its order directing that the stock be purchased, the purchase price and the time within which the payment shall be made, and may decree such other terms and conditions of sale as it determines to be appropriate." Id.

The parties have been involved in a protracted and disputatious valuation process. By statute, the date the corporation elected to purchase the shares is fixed as the "valuation date;" the value of the plaintiff's shares on that date is the amount which will be paid to her in exchange for them. Id. That date is February 16, 1989. The plaintiff is also entitled to interest on the purchase price of her shares from "the date of the filing of the election," February 16, 1989, until the date of payment in full for the shares. Id.

Determining the value of plaintiff's shares consumed years of time and the efforts of this court, the Court of Appeals, a special master and a court appointed expert, not to mention the parties, their attorneys, and their several experts. Thus far, this litigation has spawned two Court of Appeals opinions, one published and one unpublished, in addition to four published opinions of this court. Moreover, as an offshoot of this litigation, both the Court of Appeals and the District Court have published opinions concerning the claims of plaintiff's former lawyers against plaintiff. The Court of Appeals aptly observed in the unpublished opinion, which although not precedent, is binding in this case, that the "issues presented in this appeal could have been resolved without our

intervention if the parties were disposed to manage this litigation with a view toward resolving issues instead of proliferating them." *Bogosian v. Woloohojian,* No. 95–1949, slip op. at 2, 1996 WL 202226 (1st Cir. April 25, 1996). As this court is uniquely familiar with what has happened, it must be pointed out in fairness to plaintiff that the intervention of the Court of Appeals would not have been necessary had the defendant complied with the orders of this court rather than sought to terrorize the plaintiff into submission through financial starvation.

As of the valuation date, February 16, 1989, WRC's assets were substantially composed of twenty one parcels of real estate, including commercial buildings, residential apartments, and undeveloped land suitable for development. Report of the Special Master at 4. Although the parties stipulated to the value of 12 of the properties, the values of several of WRC's largest and most important properties were the subject of considerable dispute during the valuation proceedings. *Id.* at 10. Principally, the parties were unable to agree on fair values for two apartment complexes owned by WRC, the "Jamestown Apartments" and the "Seabury Apartments," a parking garage the corporation owned, the "Snow Street Block," and undeveloped land referred to as "the Shopping Center Site." The values the parties placed on these properties varied by as much as 60%. *Id.* Ultimately, after taking voluminous testimony and reviewing hundreds of documents submitted by the parties in support of their contentions, the Special Master determined that the value of the Jamestown Apartments was $5,200,000, the value of the Seabury Apartments was $970,000, the value of the Snow Street parking garage was $1,000,000, and the value of the Shopping Center Site was $3,300,000 as of the valuation date. *Id.* at 69 (Appendix A). The total value of all 21 parcels of real estate owned by WRC on the valuation date was determined by the Special Master to be $16,288,-000. *Id.*

WRC's real estate made up the majority of its total assets, which the Special Master determined to be worth $19,031,404. When WRC's outstanding liabilities of $5,791,000 were balanced against its assets' value, the net worth of WRC was calculated to be $13,-240,404. *Id.* at 65. The Special Master therefore determined that the plaintiff's one-third interest in WRC was worth one-third of the corporation's net worth, or $4,413,466. *Id.* at 67. Despite urging by the defendant, the Special Master did not then make any adjustment in WRC's net worth or in the value of the plaintiff's shares for what WRC would term "deferred tax liabilities," or the amount of capital gains tax which would be due if the properties which make up WRC's assets were sold in order to raise the funds with which to purchase the stock. *Id.* at 62.

Both parties objected to portions of the Special Master's report, a hearing was held and this court ordered the Special Master to re-evaluate certain property values under controlling principles of Rhode Island law with respect to the impact of zoning on property value, the time of valuation and the appropriate method of valuation. *Bogosian v. Woloohojian,* 831 F.Supp. 47 (D.R.I.1993). The Special Master thoroughly re-examined the questioned property values in light of the controlling law, and determined that WRC's net worth as of the valuation date was appropriately set at $14,705,404, and that the plaintiff's one-third interest in WRC was therefore worth $4,901,801. Supplementary Report of the Special Master at 28. Both parties objected on different grounds to the Supplementary Report, and this court again held a hearing on the matter. *Bogosian v. Woloohojian,* 882 F.Supp. 258 (D.R.I.1995). Like the Special Master, this court then refused to make any adjustment for "deferred tax liabilities," as WRC requested. *Id.* at 266. Therefore, after this court reviewed the Special Master's procedure and determinations, the findings contained in his Initial and Supplemental Reports were accepted and adopted as the findings of this court. *Id.*

This brief history of the Special Master's procedure demonstrates that a hallmark of this litigation to date has been unrelenting and bitter dispute between the parties on virtually every point. Certainly, other litigation involving family partnerships and business ventures which had been pursued in common by the individual parties has con-

tributed to the delay, complications and rancor experienced throughout the course of this case. One particularly complicating matter during the span of this litigation, however, and one which has resulted in related litigation, has been the strained relationship the plaintiff has had with her counsel. As a result of various disputes, she has retained six different law firms at various points in this litigation, with concomitant difficulty and delay each time she changed her representation. Although it would be expected that this steady stream of different counsel would cause additional further controversy, this process of substitution has caused plaintiff to adopt a reactive posture.

One law firm which formerly represented the plaintiff in this matter instituted separate litigation over payment of its fee in the amount of $1,079,282.30 plus interest, which at a minimum distracted the plaintiff, but also caused significant delay and unnecessary complications in this litigation. *See Flanders + Medeiros v. Bogosian,* 868 F.Supp. 412 (D.R.I.1994) (granting summary judgment in favor of the law firm), *reversed,* 65 F.3d 198 (1st Cir.1995). Indeed, this claim for legal fees was apparently the basis for WRC's contentions that it had been subjected to conflicting orders by at least two judges of this court. In its unpublished opinion filed April 25, 1996, the Court of Appeals, assuming but not holding that the purported conflict existed, in part because this court did not dispute the issue, admonished this court to resolve this seeming conflict. In fact, there was no conflict and this court had nothing to resolve. The attachment on funds which defendant improperly and without authority held in escrow had been invalidated by the prior Opinion of the Court of Appeals filed on Sept. 13, 1995. *Flanders & Medeiros Inc. v. Bogosian,* 65 F.3d 198. This again was an instance of leaving no stone unturned or unthrown to deny payment to plaintiff. There would have been nothing to argue about had the defendant complied with the orders of the court.

Perhaps the most flagrant examples of the acrimonious nature of the case, however, have been the multiple contests over payments ordered made to the plaintiff "solely," but instead made payable by defendant to plaintiff and a third party or paid by defendant to its attorney as escrow agent for plaintiff. It is clear and beyond doubt that defendant will do almost anything to avoid paying anything to plaintiff. Not only does defendant boldly assert that it made payments wilfully and intentionally in contravention of this courts orders, but in a remarkable display of cupidity, defendant demands both credit for payment to plaintiff and an "interest abatement" as of the date payment was tendered. This claim is made in spite of fact that no payment was ever authorized or accepted. The actions of the defendants with regard to these payments and attempts to make payments have given rise to a claim by each party that some equitable relief is required because of the alleged misconduct of the other. The defendant is the miscreant beyond any doubt, and simply had no justification for its actions.

If there is any doubt about who is at fault, it is necessary to describe in some detail what efforts have been made by the defendant. It is left to the reader to apply an appropriate characterization.

On July 13, 1990, after hearing, this court entered an order which, in part, directed defendant to pay $10,000 monthly to plaintiff for her sustenance on account of the purchase price of her stock. Some payments have been made directly to the plaintiff, pursuant to this court's July 1990 order. From the very beginning, however, WRC resisted making any such payment by whatever means, some fair, some foul. By this time, defendant had made abundantly clear that it would not pay anything to plaintiff except after a marathon legal wrestling match with no holds barred. First, the defendant corporation unsuccessfully appealed the order granting the plaintiff interim payment and security in the form of a mortgage on WRC's Jamestown Apartments complex. *Bogosian v. Woloohojian,* 923 F.2d 898. Of course, it had the right to take this appeal. WRC later attempted to pay the funds required by this order into a fund in an interpleader action. Although the formal entry of this court's order which disallowed this method of payment was entered August 9, 1991, the hear-

ing on the issue had been held January 23, 1991, more than six months before. The order, which specified that payment was to be made to the plaintiff "solely," remains in effect to this day.

Even after the 1991 order, the defendant corporation tried several tactics to avoid making payment directly to the plaintiff. For example, when faced with claims from WRC that it could not pay the plaintiff because it had been notified of competing claims to her assets, the plaintiff filed a "Motion for a Protective Order" with this court, seeking an order re-affirming that WRC was to pay the money as ordered in 1990 and 1991. *Bogosian v. Woloohojian,* 901 F.Supp. 68, 69–70 (D.R.I.1995). This motion was referred to a Magistrate Judge for a Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(A). *Id.* at 70. Instead of filing a Report and Recommendation, however, the Magistrate Judge entered an *ultra vires* order directing the corporation to establish an escrow into which WRC's payments were to be made. *Id.* WRC's counsel was appointed escrow agent, established accounts for deposit of the funds, and made payments to these accounts for approximately two years. In effect, the Magistrate Judge's order reversed two prior orders of the District Court.

The result of this manipulation was that the defendant's attorney was put in charge of receiving payments defendant was supposed to make to plaintiff. The Magistrate Judge was not authorized either by statute or by the very limited and explicit terms of this court's reference of the motion to enter any order with respect to payment. Moreover, contrary to Local Rule 32(c)(3), which requires the prevailing party to submit "a proposed form of order for signature of the judge to whom the case is assigned" when the non-prevailing party does not object to a Magistrate Judge's recommendation, the defendant never did so. The purpose of this rule is to prevent the apparent conflict which defendant created. Defendant knew that this court had declined to sign such an order and that it would refuse to enter such an order.

Defendant's failure simply cannot be characterized as anything but deliberate. Defendant certainly was aware that the motion had been assigned to the Magistrate for a report and recommendation only and knew also that the judge to whom the case was assigned would not sign and indeed did not sign a proposed order submitted by defendant which would effectively reverse at least two prior orders of the court. Twenty six monthly payments were made to the escrow account, totaling $260,000. Nothing was paid to plaintiff in the meantime. *Id.* The escrow order also sought to take the payments out of this action, for it provided that the proceeds of the escrow account would be distributed upon further order of the court, after resolution of defendant's motion for interpleader in this action, rather than according to this court's previous orders in this action. Defendant's motion for interpleader in this action was later denied as lacking jurisdiction. Defendant has sought no further order with regard to this subject.

Defendants' attorney, as escrow agent, paid somewhat less than half of these escrow funds, $103,087.38, to the plaintiff's former attorneys of the firm of Flanders and Medeiros as the result of an execution of a judgment against the plaintiff in other litigation referred to *supra.* The notice from the bank holding this fund to plaintiff was addressed to her, in care of defendant's law firm. One of the prior orders directing the payment to plaintiff "solely" was the result of a payment which defendant sought to make to plaintiff and one of her other former attorneys. This court had refused to allow a payment to that law firm, in part, because the law firm had represented to this court that the payment was desperately needed by plaintiff for her support. Thus, by means of its escrow device, defendant was able to pay to Mrs. Bogosian's former attorneys funds which the same attorneys came before the court and represented that Mrs. Bogosian needed for her support. Not only do these circumstances present an ethical disappointment, but also the Court of Appeals later reversed the summary judgment which supported the attachment. *Flanders & Medeiros, Inc. v. Bogosian* 65 F.3d 198.

The balance of these escrowed funds remains under the control of the defendant's attorney as escrow agent, in a bank it selected for deposit of the funds. The escrowed funds have not been paid to the plaintiff, despite this court's order in 1995, affirmed by the Court of Appeals in April 1996, that they be paid to her immediately. *Bogosian v. Woloohojian*, 1996 WL 202226 (1st Cir. April 26, 1996) (unpublished opinion). Moreover, the defendant corporation has repeatedly requested that this court alter its previous orders in light of what are termed "changed circumstances," such as demands for payment from WRC purportedly made by the plaintiff's creditors. It should be noted that Defendant has been meticulous in keeping these same creditors apprised of the opportunities they might have to sue or press litigation against plaintiff.

In addition to the money paid pursuant to this court's 1990 and 1991 orders, the defendant corporation has tendered lump sum payments to the plaintiff on two occasions, offering them in partial settlement of her claim for her shares' value. These attempted payments have been made without this court's authorization. The statute is crystal clear that *this court* shall "determine the purchase price and the time within which payments shall be made and may decree such other terms and conditions of sale as it determines to be appropriate." R.I.Gen. Laws § 7–1.1–90.1. Moreover, the Court of Appeals pointed out in *Flanders & Medeiros v. Bogosian*, 65 F.3d at 203, that "there is evidence that the possibility of Bogosian ultimately receiving property rather than cash in exchange for her shares is no pipedream." This is one of the issues which was to be addressed in this opinion and could not have been decided heretofore. Hence, any cash defendant proffered in whatever form to plaintiff was, at best, premature, which is a very charitable description of the defendants' machinations.

For example, on December 23, 1992, WRC had attempted to pay to the plaintiff, through her then attorneys at the firm of Flanders and Medeiros, $1 million in the form of two checks made out to her but physically delivered to the law firm, to which plaintiff owed fees. *Flanders & Medeiros v. Bogosian*, 65 F.3d at 200. The plaintiff refused to endorse the checks, in part because of a dispute with her then attorneys over how the funds would be distributed between her and her attorneys. *Id.* at 201. These checks have not been cashed and WRC's bank would not honor them now even if presented, as they became non-negotiable six months after they were initially issued.

WRC later deposited nearly $1.1 million in the Registry of this Court in a separate interpleader action entitled *Woloohojian Realty Corporation v. Bogosian, et al.* C.A. No. 93 0348P, filed June 25, 1993. The plaintiff in this action, six law firms which had formerly represented her, and the Internal Revenue Service were the named defendants in the interpleader action. WRC unilaterally, voluntarily, and without proper authorization, paid the total sum of $1,095,000 to the registry of the court in interpleader. Again, this action was taken without the authorization of this court, as required by R.I.Gen. Laws § 7–1.1–90.1.

On its very face, the interpleader complaint WRC filed lacks any substance. For example, the interpleader complaint does not allege and does not even hint that $1,095,000 is the sum in dispute. There is no order of the court adopting this sum as the amount in dispute, as is required by 28 U.S.C § 1335(a)(2) (plaintiff must deposit with the court the amount due under the obligation plaintiff seeks to resolve through interpleader). Paragraph 33 of the complaint in interpleader prays that WRC be permitted to pay into the Registry of the Court "all sums, if any, due or to become due to Bogosian as a result of her former shareholder interest in WRC *or the proceedings in C.A. No. 88–0373–B, including all amounts held in the escrow account.*" (Emphasis added). Certainly, as familiar as defendant was with this litigation at the time the interpleader was filed, defendant knew that the $1,095,000 it deposited with the registry bore no relation to the amount it claimed was "in controversy." *See In re Sinking of M/V Ukola*, 806 F.2d 1, 5 (1st Cir.1986) ("A court may not assert jurisdiction over an interpleader action where the money, property or bond could not

suffice to pay the largest amount in controversy."). The interpleader action was referred in sequence to two other District Judges who recused themselves. Ultimately, it was assigned to this judge. No evidence appears on the record of the interpleader action of any effort to obtain a judicial determination of the amount of the "disputed sums." There was a very good reason for this failure.

Somehow, on this record, however, WRC managed to obtain two orders from a Magistrate Judge, authorizing the deposit of one million dollars and $95,000, respectively, both dated June 2, 1994. In the interpleader action, the court referred to a Magistrate Judge for a report and recommendation WRC's motion for entry of default and Bogosian's motions to set aside default and for leave to file an answer. At the hearing, the Magistrate Judge authorized WRC to deposit a total of $1,095,000 in the Registry of the Court, to be placed in an interest bearing account. In addition, on June 7, 1994, the Magistrate Judge filed a Report and Recommendation in which he stated in part that the "proffered one million dollars has sat in a desk drawer (in check format) for over two years, accruing no interest or dividends." Although it is literally true that two checks totaling one million dollars had been delivered in December, 1992 to plaintiff's counsel but had never been negotiated, in fact, with the passage of time, (six months), these checks had become non-negotiable and the funds they represented were again subject to WRC's control long before the interpleader was filed. Undaunted, of course, WRC never submitted an order to this court with respect to this deposit in interpleader, because WRC knew full well that this court would not enter the order.

■ On this extraordinary basis, WRC, as defendant in this action, argues that its obligation to pay interest on the amount paid to the Registry of the Court ceased on the date of the payment. This is another sham perpetrated by the defendant. The defendant knew for multiple reasons that $1,095,000 was millions less than what it owed to plaintiff and indeed was also far less than the amount claimed by her creditors. The creditors' claims for attorneys fees alone then exceeded $2,200,000. Security for the payment to plaintiff resulting from this action was initially set in the amount of $10,000,000 and the order granting security in this amount was approved on appeal. The amount in dispute was many millions and many times the amount of the monies paid into the Registry of the Court. Clearly, then, the money which defendant unilaterally paid to the Registry of the Court in interpleader was intended as a honey pot to tempt litigation bees into stinging plaintiff and keep her busy defending from swarming litigation on multiple other fronts. WRC's insincerity in filing the interpleader action shows clearly in its failure to seek a judicial determination of the amount in controversy and in the further prayers of the interpleader complaint to include in the payment into the Registry of the Court the monthly payments due to plaintiff and the escrow account. Fortunately, at least the defendants in interpleader appear to understand that nothing can be accomplished in that action until this action, regarding the value of Mrs. Bogosian's shares in WRC, is concluded and the amount due to her from it finally determined.

■ While these efforts at distraction were on-going, this court heard the parties and admitted evidence concerning whether payment to plaintiff should be made by means of a distribution of property or in cash. R.I.Gen.Laws § 7–1.1–90.1 provides in part that after the fair value of the stock is determined, "... the court shall set forth in its order directing that the stock be purchased, the purchase price and the time within which the payment will be made, and may decree such other terms and conditions of sale as it determines to be appropriate." The court considered whether an exchange of property for plaintiff's shares in WRC might be more advantageous to both parties than a sale for cash, taking into consideration the tax consequences to each, and sought to determine whether an exchange of property was authorized by the statute, what the tax consequences of a property exchange would be, and whether such an exchange was feasible.

As part of this process, the court appointed a tax expert, Mr. Gary Locarno, to assist in this inquiry. Mr. Locarno filed a report with the court in which he expressed his opinion that the most "tax neutral" method of making payment to plaintiff for her stock was a reorganization or "split-off" of part of the company under 26 U.S.C. § 355. Section 355 provides that certain distributions of securities of corporations controlled by the distributing corporation do not result in recognized gain or loss to the distributee shareholders. *C.I.R. v. Gordon*, 391 U.S. 83, 91, 88 S.Ct. 1517, 1522, 20 L.Ed.2d 448 (1968). The requirements of the section "... must be applied with precision." *Id.* at 92, 88 S.Ct. at 1523. Mr. Locarno described the § 355 process as being the "least disadvantageous way" for both parties to accomplish the payment of the amount owed and further suggested that an informal letter ruling be obtained from the Internal Revenue Service concerning the validity of the proposed reorganization. Defendant presented its own expert who testified that a § 355 reorganization or split-off was not possible under the circumstances.

This court's opinion in *Bogosian v. Woloohojian*, 882 F.Supp. 258, made abundantly clear at page 266 that the tax impact of the transaction depended on the nature of the payment, which could be determined only "when the defendant corporation has committed to a course of action.... The appropriateness determination can only be made when the proposal of the corporation to accomplish the buy out is 'on the table.' It will be necessary for the corporation to prepare and present its proposal for satisfaction of the purchase price and the details of how the corporation will go about funding the purchase price." The only proposal submitted by the corporation states merely that it "may" have to sell assets to pay the purchase price in cash. Plaintiff has been no more helpful and has not suggested what assets of the corporation should be spun off and distributed to her in a § 355 reorganization. Thus, it has been left to the court to create a plan for a § 355 reorganization if one is to be accomplished.

There are no Rhode Island authorities, and indeed none have been found elsewhere, which hold that in these circumstances the court may prescribe a § 355 reorganization. A practical construction of the governing Rhode Island statute, R.I.Gen.Laws § 7–1.1–90.1, leads to the conclusion that where both parties would benefit economically, the court may order a satisfaction which will result in the lowest possible tax cost. At a minimum, the language of the statute authorizes this court to "decree such other terms and conditions of sale as it determines to be appropriate." Considering that the parties dispute whether a § 355 reorganization would meet all applicable Internal Revenue Code requirements, that the parties have not submitted any detailed proposals on how a § 355 would be structured, and the lack of judicial precedent supporting the authority of the court to direct a § 355 reorganization, however, such a reorganization cannot be considered a viable alternative. Thus, the transaction must be a cash for stock exchange.

Necessarily, each party will face certain tax consequences. If the corporation sells an asset with a high value and low tax basis to satisfy the debt, it will be subject to capital gains tax, at least. These taxes may be quite high with respect to assets which have been held for long periods of time. On the other hand, plaintiff also will suffer tax consequences, including taxes for capital gains resulting from the sale of stock which she held for a long time and likely has a low tax basis, and further, will be subject to income taxes on interest paid to her.

Defendant seeks to require plaintiff to contribute to its tax burden, at a minimum to the extent of one-third of the taxes defendant may be required to pay. There shall not be a shifting of any part of the corporation's tax burden to plaintiff, for a number of reasons. First, defendant resists the proposal even to attempt a § 355 reorganization, which, according to Mr. Locarno's opinion, even if it fails, would place the parties in a position no worse than if a cash sale is accomplished without shifting the tax burden. Second, Defendant does not have to sell any property at all to pay for the plaintiff's stock. Mr. Locarno has set out a scenario involving

loans secured by WRC property which has some tax advantages to defendant and which the court finds entirely credible and reliable. Defendant could borrow the money to pay for the stock and would not incur capital gains taxes. Thus, defendant's unilateral decision to sell property is the immediate cause of its unfavorable tax consequences. Third, if defendant's tax consequences are an appropriate consideration for reimbursement, the plaintiff should not be treated any differently. In fact, it was not her idea to sell her stock in the first place, as defendant elected to force plaintiff to sell her shares. Plaintiff will undoubtedly have capital gains and income tax costs. It would be inequitable to order reimbursement of the defendant's tax liability without reimbursement of the plaintiff's. In these circumstances, the parties should be left in the position in which they are and each will have to bear its own tax consequences.

This court must also determine the appropriate interest rate to be paid to plaintiff. A hearing on this issue yielded further volumes of testimony and numerous exhibits. Unsurprisingly, this hearing revealed much disagreement and little common ground between the parties concerning the method used to set the interest rate, what the appropriate rate is, and whether interest should be compound or simple.

■■ This question is undisputedly one of state law. *Loft v. Lapidus*, 936 F.2d 633, 639 (1st Cir.1991). Rhode Island law provides that the "petitioner shall be entitled to interest on the purchase price of the shares from the date of the filing of the election to purchase the shares," but does not specify a rate of interest to be paid on the purchase price or whether interest should be simple or compound. Rhode Island Gen.Laws § 7–1.1–90.1. As the petitioner for dissolution, the plaintiff is entitled to an appropriate rate of interest on the value of her shares between the time the corporation chose to avoid dissolution by electing to purchase her shares and the date of payment in full for the shares. *Id.; see also Bogosian v. Woloohojian*, 882 F.Supp. at 265. An interest award merely compensates the shareholder for the loss of use of her money while the shares, and the

value they represent, are held and enjoyed by the corporation during the purchase and valuation process. *See In re Valuation of Common Stock of McLoon Oil Co.*, 565 A.2d 997, 1007 (Me.1989); *Universal City Studios, Inc. v. Francis I. duPont & Co.*, 334 A.2d 216, 222 (Del.Supr.1975).

■ The appropriate rate of interest is "fair and reasonable under the circumstances," but the parties disagree sharply about what constitutes a reasonable rate. *Bogosian v. Woloohojian*, 882 F.Supp. at 265. The parties have extensively briefed, presented evidence on, and argued the interest rate issue, and have argued for setting the interest rate at between 6 and 8% (defendant) and 12 and 15% (plaintiff). Both parties submitted evidence on what a prudent investor would do with a fund similar to the one which would have been available to the plaintiff in 1989 had the corporation paid the value of her shares at that time, and on how closely the hypothetical investor's personal characteristics should match the plaintiff's.

The plaintiff's expert, Mary Calhoun, calculated the appropriate rate by determining what a hypothetical prudent investor in circumstances like the plaintiff's would have realized on a cash fund of the same size invested in 1989. Ms. Calhoun testified that a prudent investor, having a fund of $4.9 million available in 1989, would have obtained a diversified portfolio and realized an annual rate of return of between 12 and 13% on average during the period from 1989 to 1996.

The defendant corporation presented three witnesses who sharply disputed Ms. Calhoun's assumptions and results. Dr. Poole, an economist expert for the defendant, used the average rate of return that was actually earned by the household sector in the U.S. economy as his measure. He concluded that an 8.44% rate of return was appropriate. Mr. Sommer, defendant's alternate expert, completed "an informal survey" of investment professionals and determined that even a "risky" investment strategy for a fund as large as this one would have been in 1989 would have yielded an 8.47% return. The defense also offered the expert testimony of Richard Starfield in rebuttal of Ms. Calhoun's testimony. Starfield assumed that

the plaintiff is a "secured creditor" of WRC, because by order of this court she holds a $10 million mortgage on property owned by WRC as security for the debt owed to her. *Bogosian v. WRC*, 923 F.2d at 903. Mr. Starfield therefore calculated that the plaintiff is entitled to no more than a "default" rate of interest, which he set at 6%.

WRC argues that the hypothetical investor used to measure the interest rate in this case should be like the plaintiff in age and personal financial situation, but not necessarily like the plaintiff in the amount to be invested. For example, WRC would describe the hypothetical investor by whose actions the court is to measure the appropriate rate of interest as "older" and under "financial strain" and thus "more conservative" than a younger investor without such financial demands. Unsurprisingly, WRC's version of the "prudent investor" limits the selection of investment vehicles to conservative ones, such as bank deposits, Treasury notes, certificates of deposit, and commercial paper. *See In re McLoon*, 565 A.2d at 1006. These investments are considered "safe," because they offer very little risk of principle loss, but concomitantly low interest rates. Moreover, one of WRC's experts, Dr. Poole, based his interest rate analysis on average returns on household investments during the relevant period, but did not account for the unusually large amount of the fund which would have been available to the plaintiff. Using national average figures without taking account of the unusually large fund the plaintiff would have had available to her, contrasted with the limited savings of the average household, as Dr. Poole's analysis does, distorts the return a prudent investor in plaintiff's situation would have obtained. For example, assigning up to one-third of the fund to bank accounts and short-term depository accounts, to provide "liquidity" in keeping with the national average percentages, would require leaving over $1.6 million in such accounts. There can be no dispute that a plan to invest a fund of $4.9 million in 1989 which included placing $1.6 million in low-interest bank accounts to provide for "liquidity" would be an imprudent one to have implemented. Dr. Poole's testimony must therefore be questioned because of his basic assumptions.

The plaintiff takes a different tack. Her hypothetical "prudent investor" would not limit herself to rock-solid conservative investments, but would maintain a diversified portfolio, allowing for both growth and security of principle and income. The investment vehicles the plaintiff's "prudent investor" would employ include growth mutual funds, intermediate-term corporate bonds, and money market funds. These investment vehicles offer higher interest rates than those used by WRC's hypothetical investor, but also carry the risk of principal loss, and therefore are considered less conservative. The plaintiff's expert on interest rate, Mary Calhoun, testified that using such investment vehicles would have been appropriate in 1989 for a person of the plaintiff's age and financial situation.

Plaintiff has also suggested a further test for the determination of a fair interest rate. Plaintiff points out that the "prudent investor" interest rate makes no allowance for the fact that the plaintiff has been essentially a "forced" creditor of the corporation in the amount of her shares' value since the corporation chose to purchase the shares instead of being dissolved. *See Felder v. Anderson, Clayton & Co.*, 159 A.2d 278, 287 (Del.Ch. 1960). Under these circumstances, the rate of interest which WRC would have paid to a third party to borrow money to pay the plaintiff at the time it elected to purchase her shares is persuasive evidence with respect to the interest which should be paid to the plaintiff. *Id.* According to the testimony of WRC's witnesses, Mr. Starfield and Mr. Pilkauskas, a bank would have charged WRC the prime rate of interest plus one to two percent for a loan of that size in 1989. *See Gorenstein Enterprises, Inc. v. Quality Care–USA Inc.*, 874 F.2d 431, 436 (7th Cir. 1989) (prime rate of interest persuasive evidence of "market rate"). The rate of interest which WRC's secured creditors would expect to receive would therefore have been between 10.87% (then the prime rate of interest) and 12.87% (then prime plus 2%). This rate takes into consideration both current payment of the amount due and adequate security for the loan, however, and the plaintiff received neither in her position as forced

creditor to the corporation. *Felder*, 159 A.2d at 287 (taking into account that the "lender" is an individual, not a bank, and that the loan term is somewhat longer than usual business loan term). An upward adjustment for the additional risk to which the plaintiff was put compared to a bank lender and the fact that the corporations a closely held corporation with limited liquidity would place the appropriate comparable rate in the range of 12 to 14%. *See Gorenstein Enterprises*, 874 F.2d at 436 (risk to plaintiff of default an appropriate actor in determining pre-judgment interest rate).

Considering both the "prudent investor" standard and that the plaintiff has been an involuntary creditor of WRC since the corporation elected to purchase her shares, this court sets the interest rate to be paid on the value of her shares at 11%. This rate of interest reflects a return which the plaintiff could have realized on prudent investments during the relevant period, with some allowance for a preference for "conservative" and "safe" investment vehicles, as a result of her age and financial circumstances. *See Lexington Ins. Co. v. Abington Co.*, 621 F.Supp. 18, 21 (E.D.Pa.1985) ("market rate" of interest used to fully compensate plaintiff for the loss incurred); *In re McLoon*, 565 A.2d at 1007 (safe investments). This rate of interest also reflects the fact that the plaintiff has been a forced creditor of WRC since it elected to purchase her shares, and that the "forced loan" she made was on different, and riskier, terms than would have been acceptable to a third-party lender under the circumstances. *See Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 145 (2d Cir. 1993) (pre-judgment interest authorized to make plaintiff whole by preventing what would be, in effect, an "interest-free" loan of the amount of damages to defendant); *Felder*, 159 A.2d at 287.

■ WRC continues to dispute this court's ruling that compound interest will be awarded in this case. *Bogosian v. Woloohojian*, 882 F.Supp. at 265 ("Simple interest simply does not accomplish the desired end."). Indeed, this is a situation in which it might fairly be said that failing to award compound interest would not fully compensate the plaintiff, and would therefore amount to an abuse of this court's discretion. *See Saulpaugh*, 4 F.3d at 145; *Id.* It is clearly within the discretionary power of this court to order compound interest to fully compensate the plaintiff. *See Gorenstein*, 874 F.2d at 437; *Bio–Rad Laboratories, Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 969 (Fed.Cir. 1986). This discretion extends to the frequency of compounding, which may be, according to the circumstances of each case, annually, quarterly, monthly, or even daily. *Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 829 (Fed.Cir.1989); *see also Hoechst Celanese Corp. v. BP Chemicals, Ltd.*, 846 F.Supp. 542, 550 (S.D.Tex.1994) (quarterly compounding) *aff'd* 78 F.3d 1575 (Fed.Cir. 1996); *Uniroyal, Inc. v. Rudkin–Wiley Corp.*, 721 F.Supp. 28, 29 (D.Conn.1989) (daily compounding); *Federal Barge Lines, Inc. v. Granite City Steel, Div. of Nat'l Steel Corp.*, 664 F.Supp. 453, 454 (E.D.Mo.1987) (annual compounding).

It has already been pointed out that the plaintiff has been effectively a forced creditor of WRC for the past eight years, and that she should be compensated at least as a voluntary creditor would have been under similar circumstances. *Id.* ("Not only is the shareholder entitled to what the shareholder otherwise would have earned, but [also] to the avails of any reinvestment of those earnings."); *see also Lexington Ins. Co.*, 621 F.Supp. at 22. A third-party lender, voluntarily loaning WRC $4.9 million without adequate security and not being paid currently for eight years would certainly demand and be paid a compound rate of interest. *See Lexington Ins. Co.*, 621 F.Supp. at 22. Accordingly, the interest paid to the plaintiff shall be compounded monthly. *Datascope Corp.*, 879 F.2d at 829 (court has discretion to award interest compounded monthly); *see also Marfia v. T.C. Ziraat Bankasi*, No. 88–3763(DC), 1997 WL 362487, at *2 (S.D.N.Y. July 1, 1997) (monthly compounding allowed); *Andrew Corp. v. Gabriel Electronics, Inc.*, 785 F.Supp. 1041, 1055 (D.Me.1992) (same); *New Orleans Elec. Pension Fund v. Newman*, 784 F.Supp. 1233, 1238 (E.D.La.1992) (same); *T.A. Pelsue Co. v. Grand Enterprises, Inc.*, 782 F.Supp. 1476, 1502 (D.Colo.1991) (same). Monthly compounding of interest

comports with the purpose of this interest award, to adequately compensate the plaintiff for the loss of use of her funds during the term of this litigation. *See BIC Leisure Products, Inc. v. Windsurfing Int'l, Inc.*, 774 F.Supp. 832, 837 (S.D.N.Y.1991), *aff'd* 1 F.3d 1214 (Fed.Cir.1993); *Universal Studios*, 334 A.2d at 222.

Despite claims made by both parties, neither party has proven entitlement to an equitable adjustment in the interest rate because of alleged wrongdoing by the other in the course of this action. *See* Grant, *Appraisal Rights: Allowance for Prejudgment Interest*, 17 B.C. Indus. & Comm.L.Rev. 1, 10 (1975) (court has discretion to deny interest award where granting interest would be inequitable). Nor has the alleged wrongful conduct of either party had any part in the decision that compound interest will be paid. *See Rapid–American Corp. v. Harris*, 603 A.2d 796, 808 (Del.Supr.1992) (where the trial court has discretion to award compound interest, the court may consider, but is not required to find, a party's bad faith). Interest will be calculated at rate of 11%, compounded monthly from the date of the corporation's election to purchase the plaintiff's stock until the date of payment in full to plaintiff of the value of her shares. R.I.Gen. Laws 7–1.1–90.1; *Datascope Corp.*, 879 F.2d at 829 (court has discretion as to frequency of compounding); *Uniroyal, Inc.*, 721 F.Supp. at 29.

■ The parties have agreed to apply certain payments made to the plaintiff as of the date plaintiff received them. Of course, plaintiff is entitled to interest from the date of the defendants' election to purchase the shares to the date payment was actually received, at the rate of 11%, compounded monthly. These include payments WRC made to the plaintiff and the Internal Revenue Service pursuant to this court's order, and other payments made by agreement of the parties. It is agreed that these payments total $1,697,217.38, as of October 15, 1996. All of these amounts, and any amounts which it is agreed were paid after October 15, 1996, are to be credited first against the interest due as of the date of each payment, and any amount in excess of

interest then due shall be credited to the principal amount then due, in accord with the generally accepted "United States Rule." *See Darr v. Muratore*, 8 F.3d 854, 861 (1st Cir. 1993) (citing numerous cases in accord with the "United States Rule" and holding "we are not inclined to conjure a different rule under Rhode Island law."). All additional payments will also be applied first to the interest then due, the balance, if any, to be applied to the principle amount then due.

WRC claims, and the plaintiff disputes, that the corporation is entitled to "interest abatements" or "payment credits" for other amounts. WRC claims that no interest should accrue on any amount it offered in payment of its debt, as of the date such payment was tendered, whether or not the funds were paid to the plaintiff or for her benefit as a result of WRC's offer. *See Illini FS, Inc. v. Myerscough*, 137 Ill.App.3d 861, 92 Ill.Dec. 440, 445, 484 N.E.2d 1385, 1390 (1985) (partial payment on a debt prevents accrual of interest on the portion paid). WRC would term such release from interest liability an "interest abatement." For example, WRC claims that as of the date it tendered $1 million to the plaintiff's former attorneys in this matter, December 23, 1992, interest should no longer have accrued on that amount, because the plaintiff was under a supposed duty to accept and apply the funds WRC unilaterally offered, on the terms it directed. *See, e.g., National Bank of Commonwealth v. Mechanics' Nat'l Bank*, 94 U.S. 437, 439, 24 L.Ed. 176 (1876) (where a creditor *accepts* voluntary payment, it must be applied as the debtor directs) (emphasis added). WRC further asserts that the plaintiff's refusal to allow it to substitute collateral so that it could make new financing arrangements entitle it to an interest abatement on the $2.3 million it allegedly would have raised from the date its request was denied by the court, August 15, 1995. In addition, WRC paid $1,095,000 into the Registry of Court in an interpleader action, on March 28 and April 28, 1994, for which it claims an interest abatement is due. $1,000,000 of this amount was the same money that defendant sought to force upon plaintiff in December, 1992. Finally, WRC makes a similar claim to an "interest abatement" for payments made be-

tween June 15, 1993 and May 15, 1995 into an escrow account, which it claims it was directed to do by a Magistrate Judge's order.

■ WRC also asserts entitlement to "payment credit" against the total amount owed for payments into escrow and the Registry of Court. These "payment credits," if allowed, would count the money WRC claims it attempted to pay towards the total amount owed, in essence reducing the principal and interest owed by the amount of the deposit made in escrow or into the Registry of Court, without regard to the fact that the money was not paid to the plaintiff and it has not yet been determined whether or how the money will be paid out. Fundamentally, WRC claims with respect to the transactions for which it seeks an interest abatement or payment credit that the plaintiff either acted in bad faith with respect to the payment offered or constructively accepted the payment. *See Libby v. Hopkins,* 104 U.S. 303, 308, 26 L.Ed. 769 (1881) (creditor had duty to either accept or return payment offered by debtor); *New York Life Ins. Co. v. Miller,* 135 F.2d 550, 553 (9th Cir.1943) (acceptance of payment may be implied from circumstances). As has been pointed out, neither of these payments were approved by this court, as is clearly required by R.I.Gen.Laws § 7–1.1–90.1. Nor has defendant submitted an order to this court concerning the unauthorized orders of the Magistrate Judge, as required by Local Rule 32(c)(3).

Questions of payment credit and interest abatement raised as a result of WRC's unilateral tender of a million dollars on December 23, 1992, consisting of two checks dated December 22, 1992, each bearing the notation "Partial Payment for Stock Acquisition," have been answered at least partially by the First Circuit in *Flanders & Medeiros, Inc. v. Bogosian,* 65 F.3d 198. In that opinion, the First Circuit held that while this action was pending and whether the plaintiff would receive cash or property in satisfaction of the debt WRC owed to her remained an unresolved issue in this action, plaintiff may well have had legitimate reason for refusing to accept WRC's proffered payment on WRC's unilateral terms. *Id.* at 203. There is no doubt in this court's mind. Plaintiff's refusal to accept the payment was perfectly proper for two reasons: 1) she had a right to do so, and 2) this court had not approved the payment.

The plaintiff's resistance to WRC's proposal to substitute other collateral for that ordered to be given to her by this court does not merit a credit to defendant. It was the court that frustrated the effort by denying defendant's application to substitute collateral. Plaintiff had a right to object and the court had the authority to deny the request.

Furthermore, apart from some of the monthly payments required of defendant, none of the money WRC attempted to transfer to the plaintiff, except approximately $103,000 of the amount paid into escrow pursuant to the Magistrate Judge's order, has been applied to her benefit or actually paid over to her. *See New York Life v. Miller,* 135 F.2d at 553 (acceptance of partial debt payment, whether express or implied, a necessary element of charging payment against creditor). Defendant argues that statements by plaintiff's attorneys that monies were paid estop plaintiff. Monies were paid, but they were not paid to plaintiff. Therein lies the rub. Despite WRC's protestations to the contrary, the plaintiff's conduct with respect to WRC's unilateral offers of payment did not amount to a "constructive acceptance" of any of these funds which would entitle WRC to the credits it seeks. *New York Life v. Miller,* 135 F.2d at 553. The $1 million WRC attempted to pay to the plaintiffs attorneys was never actually transferred either to the firm or the plaintiff. Somewhat less than half of the amount paid into escrow, $103,000, was attached and paid over to one of the plaintiffs creditors, although without her consent, and might arguably have been applied to her benefit, but the remainder is still held by the defendant's attorney as her escrow agent and cannot be said to entitle the defendant to credit of any kind. The amounts held in interpleader by the Registry of Court have not been applied for the plaintiff's benefit, but remain there. *Cf Murphy v. Travelers Ins. Co.,* 534 F.2d 1155, 1165 (5th Cir. 1976) (applying Texas law, and finding mere "unconditional surrender" by party making payment into Registry of court, without re-

gard to "acceptance" by claimant, sufficient to justify suspension of interest accrual, where only question was amount of debt); *Phillips Petroleum Co. v. Adams,* 513 F.2d 355, 370 (5th Cir.1975) (same).

Under these circumstances, to allow payment credits or interest abatements for WRC's unilateral attempts to make payment on its own terms, without the permission of this court, would be to reward the corporation for stubbornly attempting to do what it should not. R.I.Gen.Laws § 7–1.1–90.1 in part provides "... *the court* shall set forth in its order directing that the stock be purchased, the purchase price *and the time* within which such payment shall be made ...." Therefore, WRC will not receive an interest abatement or payment credit for any of the above attempts to circumvent the statutory authority of this court to determine how and when its debt to the plaintiff would be satisfied. *Id.*

With respect to the amount paid to one of the plaintiff's creditors from the escrow for which the defendant's attorney acts as escrow agent, however, WRC is entitled to payment credit of the amount paid, because plaintiff agrees that it is entitled to credit. This is not to say, however, that the funds remaining in escrow, or any other funds that this court's orders direct WRC to pay to the plaintiff may instead be paid to anyone other than the plaintiff. Only when funds are applied pursuant to this court's order can WRC claim to be entitled to any credit on the total amount it owes. *Id.; see also Flanders & Medeiros v. Bogosian,* 65 F.3d at 203.

WRC shall pay the plaintiff, *and only to the plaintiff personally and individually,* $4,901,801.50 plus 11% interest on the balance due and owing from time to time, compounded monthly from February 16, 1989 until the plaintiff has been paid in full for all principle and interest. WRC will receive credit against the amount due and owing for payments previously made, as of the date each payment was actually received or credited either by plaintiff or the Internal Revenue Service, as the parties have agreed, and for any amounts the parties agree have been paid since October 15, 1996. WRC will pay interest at the rate of 11% on the balance

due and owing, compounded monthly from February 16, 1989. Payment will be applied, as of the date received, first to interest due and owing on the date of payment, then to principle. All amounts, interest and principle due to the plaintiff from WRC shall be paid at least quarterly, beginning on November 1, 1997, and extending for a period of three years from the date of judgment in this action. Each quarterly payment shall be not less than one-twelfth (1/12) of the total of principle and interest due on the date of entry of judgment in this action. Defendant shall also continue to pay plaintiff $10,000 per month for her sustenance, in accord with this court's previous orders, until plaintiff is paid in full. All payments shall be applied first to payment of interest then due, with any remaining amount applied to principle then due.

This court had previously ordered defendant to provide $10,000,000 security for payment, in the form of a mortgage on the Jamestown Apartments. The Special Master determined the value of the Jamestown Apartments to be $5.5 million and the court accepted that value. The payments which defendant is obligated to make exceed the value of the Jamestown Apartments. Thus, plaintiff should have further and additional security in accord with the requirements of R.I.Gen.Laws § 7–1.1–90.1.

Plaintiff shall have a lien on all real estate WRC owns, monies paid to the registry of court in C.A. No. 93–0348P, and funds held in escrow by defendant's attorney, to secure the full amount of the difference between the then balance from time to time of the total amount of principle and interest due and owing to plaintiff and the value of Jamestown Apartments as determined by the Special Master in this action, $5.5 million. This lien will be subject to valid bonafide encumbrances held by third parties not related to WRC or its remaining shareholders and existing on the date of this order. WRC shall continue to provide security for all unpaid amounts, both interest and principle, in the form of a mortgage on the Jamestown Apartments, as the court has previously ordered. Plaintiff's lien on each and every parcel of WRC's real estate shall be perfected by filing

a notice of lien in the land evidence records of the city or town where the parcel is located. Liens on the funds held in the escrow account and the Registry of Court are perfected by virtue of the judgment in this action.

When defendant has paid plaintiff the total amount of principle and interest due and owing to plaintiff, plaintiff will transfer her shares to the defendant corporation.

The parties shall bear their own costs, but the expenses of the valuation proceedings as defined by R.I.Gen.Laws § 7–1.1–90.1 shall be paid, two thirds by defendant and one third by plaintiff.